No. 4:25-cv-00618

_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

_____

In re THE CONTAINER STORE GROUP, INC., et al.,
Debtors.

_____

KEVIN M. EPSTEIN, UNITED STATES TRUSTEE
Appellant,

v.

THE CONTAINER STORE GROUP, INC., et al.,
Appellees.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

_____

### BRIEF OF APPELLANT KEVIN M. EPSTEIN,
### UNITED STATES TRUSTEE

_____

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
Trial Attorney

Department of Justice
Executive Office for United States
   Trustees
441 G Street, N.W., Suite 6150
Washington, DC  20530
(202) 307-1399
E-mail: Beth.A.Levene@usdoj.gov

MILLIE APONTE SALL
Assistant United States Trustee
Tex. Bar No. 01278050/Fed. ID No. 11271
HA M. NGUYEN
Trial Attorney
CA Bar No. 305411/Fed ID No. 3623593
VIANEY GARZA
Trial Attorney
Tex. Bar No. 24083057/Fed. ID No. 1812278

Department of Justice
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, Texas 77002
(713) 718-4650 – Telephone
E-mail: Millie.Sall@usdoj.gov
E-mail: Ha.Nguyen@usdoj.gov
E-mail: Vianey.Garza@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

REQUEST FOR ORAL ARGUMENT ............................................. 1

INTRODUCTION ............................................................................ 2

STATEMENT OF APPELLATE JURISDICTION ....................... 3

STATEMENT OF THE ISSUES ...................................................... 4

STATEMENT OF THE CASE .......................................................... 4

I.    Statutory Framework ............................................................. 4

 A.    Confirmation of Chapter 11 Plans. ............................... 4

 B.    The Role of the United States Trustee ......................... 5

II.   Statement of the Facts ........................................................... 6

 A.    Debtors File Chapter 11 Petitions After Entering a Transaction Support Agreement with Some of Their Creditors. ............... 6

 B.    The Plan Extinguishes Non-Debtors' Third-Party Claims Unless They Specifically Opt Out or Object. ............... 7

 C.    The Same Day Debtors File Their Plan, the Court Approves Their Proposed Solicitation and Opt-Out Procedures. ............... 12

 D.    The Bankruptcy Court Confirms the Plan Over the United States Trustee's and the SEC's Objections. ............... 16

SUMMARY OF THE ARGUMENT ................................................ 18

STANDARD OF REVIEW .............................................................. 21

ARGUMENT ..................................................................................... 21

I.    Failure to Opt Out Is Not Consent to a Third-Party Release. ............... 21

 A.    State Law Governs Whether Parties Have Agreed to a Release. ............... 21

 B.    Under State Law, Indeed Under Black-Letter Contract Law, Silence Is Not Acceptance. ............... 24

 C.    Remaining Silent by Failing to Opt Out Does Not Constitute Acceptance of an Offer to Release Claims Against Non-Debtors Under State Law. ............... 28

  1.    A Failure to Opt Out by Those Who Did Not Vote Is Not Consent to a Third-Party Release. ............... 31

2.    A Failure to Opt Out by Those Who Voted on the Plan Is Not Consent to a Third-Party Release. ............................................ 34

D.    The Bankruptcy Court's Default Theory of Consent Fails. ..................... 35

E.    Debtors' Class-Action Analogy Contravenes Supreme Court Precedent. ........................................................................................... 38

II.    The Bankruptcy Court Erred by Imposing the Injunction Barring Claims Between Non-Debtors. ............................................................... 42

III.    The Bankruptcy Court Erred by Imposing the Gatekeeping Injunction........... 47

CONCLUSION .................................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aggreko, L.L.C. v. Chartis Specialty Ins. Co.,*
  942 F.3d 682 (5th Cir. 2019) ..................................................................... 24

*Amchem Prod., Inc. v. Windsor,*
  521 U.S. 591 (1997) ........................................................................... 40, 41

*In re Arrowmill Dev. Corp.,*
  211 B.R. 497 (Bankr. D.N.J. 1997) ...................................................... 22, 23

*In re Arsenal Intermediate Holdings, L.L.C.,*
  No. 23-10097 (CTG), 2023 WL 2655592 (Bankr. D. Del. Mar. 27,
  2023) ...................................................................................................... 36

*Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas,*
  *Inc.),*
  266 F.3d 388 (5th Cir. 2001) ......................................................... 43, 44, 48

*Bank of NY Trust Co., NA v. Official Unsecured Creditors Comm. (In re Pacific*
  *Lumber Co.),*
  584 F.3d 229 (5th Cir. 2009) ................................................................... 36

*Bass v. Denney (In re Bass),*
  171 F.3d 1016 (5th Cir. 1999) .................................................................. 43

*Beverick v. Koch Power, Inc.,*
  186 S.W.3d 145 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) .............. 24, 25

*Bullard v. Blue Hills Bank,*
  575 U.S. 496 (2015) .................................................................................. 3

*Butner v. United States,*
  440 U.S. 48 (1979) ................................................................................. 21

*In re Chassix Holdings, Inc.,*
  533 B.R. 64 (Bankr. S.D.N.Y. 2015) ..................................................*passim*

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ............................................................................ 44, 46

*Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.),*
   597 B.R. 597 (S.D. Tex. 2019) ...................................................... 36

*In re Couture Hotel Corp.,*
   554 B.R. 369 (Bankr. N.D. Tex. 2016).............................. 26, 27, 30, 34

*De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente),*
   409 B.R. 842 (Bankr. S.D. Tex. 2009) ........................................... 22

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) .................................................................. 45

*Elfar v. Wilmington Trust, N.A.,*
   No. 20-0273, 2020 WL 7074609 (E.D. Cal. Dec. 3, 2020), *adopted by*
   2020 WL 1700778 (E.D. Cal. Feb. 11, 2021) .................................. 25

*Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18
   (Bankr. D. Del. Dec. 5, 2019)....................................................... 33

*Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools,
Inc.,*
   246 S.W.3d 42 (Tex. 2008)....................................... 24, 25, 26, 34

*Feld v. Zale Corp. (In re Zale Corp.),*
   62 F.3d 746 (1995).......................................... 43, 44, 46, 48

*Genesis HealthCare Corp. v. Symczyk,*
   569 U.S. 66 (2013) .................................................................. 39

*Harrington v. Purdue Pharma L.P.,*
   603 U.S. 204 (2024) .........................................................*passim*

*Heartland Fed. Savs. & Loan, Ass'n v. Briscoe Enters. (In re Briscoe Enters.),*
   994 F.2d 1160 (5th Cir. 1993) ............................................. 5, 24

*Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.,*
   643 F.2d 1185 (5th Cir. 1981) ...................................................... 28

*Houston v. Holder (In re Omni Video, Inc.),*
   60 F.3d 230 (5th Cir. 1995)......................................................... 22

*Imperial Ind. Supply Co v. Thomas,*
   825 F. App'x 204 (5th Cir. Sept. 2, 2020) .............................. 27, 28

*Nexpoint Advisers, L.P. v. Highland Cap. Mgmt. L.P. (In re Highland Cap. Mgmt. L.P.),*
    48 F.4th 419 (5th Cir. 2022) ............................................................17, 21, 49

*Norcia v. Samsung Telecomms Am., LLC,*
    845 F.3d 1279 (9th Cir. 2017) ................................................................ 28, 29

*Patterson v. Mahwah Bergen Retail Grp., Inc.,*
    636 B.R. 641 (E.D. Va. 2022) .......................................................... 23, 28, 40, 41

*Perez v. Everett (In re Perez),*
    30 F.3d 1209 (9th Cir. 1994) ......................................................................... 3

*Redmond v. Williams,*
    No. 22-cv-00910, 2023 WL 7984388 (E.D. Tex. Sept. 13, 2023) ............................ 27

*In re Robertshaw US Holding Corp.,*
    662 B.R. 300 (Bankr. S.D. Tex. 2024) ...................................................... 36, 39

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.,*
    559 U.S. 393 (2010) ................................................................................ 22

*In re Smallhold, Inc.,*
    No. 14-10267, 2024 WL 4296938 (Bankr. D. Del. Sept. 25, 2024) ...................*passim*

*Sosna v. Iowa,*
    419 U.S. 393 (1975) ............................................................................. 39, 40

*In re SunEdison, Inc.,*
    576 B.R. 453 (Bankr. S.D.N.Y. 2017) ....................................................23, 30, 31

*Surtain v. Hamlin Terrace Found.,*
    789 F.3d 1239 (11th Cir. 2015) ................................................................... 37

*Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.,*
    52 S.W.3d 128 (Tex. 2000) .........................................................................*passim*

*Matter of Tex. Extrusion Corp.,*
    844 F.2d 1142 (5th Cir. 1988) ...................................................................... 3

*Texas v. Triax Oil & Gas, Inc.,*
    966 S.W. 2d 123 (Tex. App. 1998) ................................................................ 25

*The Levin Law Grp., P.C. v. Sigmon,*
    No. 14-08-01165-CV, 2010 WL 183525 (Tex. App. 2010) ................................*passim*

*Thomson v. Wooster,*
    114 U.S. 104 (1885) ................................................................................ 37

*In re Tonawanda Coke Corp.,*
    662 B.R. 220 (Bankr. W.D.N.Y. 2024)................................................... 23

*Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.,*
    549 U.S. 443 (2007) ................................................................................ 21

*Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,*
    665 S.W. 2d 443 (Tex. 1982) ......................................................... 27, 30

*United States v. Olano,*
    507 U.S. 725 (1993) ................................................................................ 37

*United States v. Sanchez-Gomez,*
    584 U.S. 381 (2018) ......................................................................... 20, 39

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ................................................................................ 40

*In re Washington Mut., Inc.,*
    442 B.R. 314 (Bankr. D. Del. 2011)........................................... 31, 34

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ................................................................................ 45

*Wells Fargo Bank, N.A. v. Stewart (In re Stewart),*
    647 F.3d 553 (5th Cir. 2011) ................................................................ 44

*In re Wool Growers Cent. Storage Co.,*
    371 B.R. 768 (Bankr. N.D. Tex. 2007)................................................. 23

## Statutes

11 U.S.C. § 101...................................................................................... 23

11 U.S.C. § 105(a)................................................................................... 45

11 U.S.C. § 307........................................................................................ 6

11 U.S.C. § 1101 ............................................................................................. 23

11 U.S.C. §§ 1101 et seq. .................................................................................. 4

11 U.S.C. § 1109(a) ......................................................................................... 16

11 U.S.C. § 1122 ............................................................................................... 5

11 U.S.C. § 1126 ............................................................................................... 5

11 U.S.C. § 1126(a) ..................................................................................... 5, 30

11 U.S.C. § 1126(f) ......................................................................................... 30

11 U.S.C. § 1126(g) ......................................................................................... 30

11 U.S.C. § 1129 ........................................................................................... 3, 5

11 U.S.C. § 1129(a)(8) ..................................................................................... 30

11 U.S.C. § 1129(b) ......................................................................................... 30

11 U.S.C. § 1141(b) ......................................................................................... 22

28 U.S.C. § 157(a) ............................................................................................. 3

28 U.S.C. § 157(b) ............................................................................................. 3

28 U.S.C. § 158(a)(1) ......................................................................................... 3

28 U.S.C. § 158(c)(2) ......................................................................................... 4

28 U.S.C. §§ 581–589 ........................................................................................ 5

28 U.S.C. 1334(a) ............................................................................................. 3

28 U.S.C. § 1334(b) ............................................................................. 20, 43, 47

## Other Authorities

7 Collier on Bankruptcy ¶ 1100.01 (Alan N. Resnick & Henry J. Sommer
    eds., 16th ed.) ............................................................................................. 4

1 CORBIN ON CONTRACTS § 3.19 (2018) .......................................................... 26

Fed. R. Bankr. P. 3020(e) ................................................................................ 17

Fed. R. Bankr. P. 8002 ................................................................................ 4

Fed. R. Bankr. P. 8018(a)(1) ...................................................................... 1

Fed. R. Civ. P. 23(b)(3) ............................................................................ 39, 40

Fed. R. Civ. P. 23(g) .................................................................................. 40

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ................................ 5

RESTATEMENT (SECOND) OF CONTRACTS § 17(1) (1981) ................................ 25

RESTATEMENT (SECOND) OF CONTRACTS § 69 ................................................ 25

RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) .................... 25, 26, 34, 35

RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. And ........................ 26

RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c ................................ 26

4 WILLISTON ON CONTRACTS § 6:67 (4th ed.) ............................................ 26

## REQUEST FOR ORAL ARGUMENT

Appellant, the United States Trustee, respectfully requests oral argument because he believes it will aid in the Court's consideration of the issues presented on appeal.  See Bankr. R. Fed. P. 8019.

The United States Trustee further requests that the Court set argument for the earliest available date after briefing closes.  The United States Trustee asked Appellees to agree to an expedited briefing schedule, but they declined.  Nevertheless, the United States Trustee believes that expediting this appeal is important.  Expediting the appeal will accommodate Appellees' concerns about any alleged harms from a stay pending appeal.  The United States Trustee filed in the bankruptcy court an emergency motion for a stay pending appeal, but the bankruptcy court denied emergency treatment.  1ER25-26 (Dkt. Nos. 210, 213).[1]  A hearing on the stay motion has been scheduled for March 11, 2025.  1ER26.  If the bankruptcy court's order is not stayed, expediting the appeal will help minimize prejudice to thousands of non-debtors who are precluded by the order from suing thousands of other non-debtors while the appeal is pending.

For these reasons, the United States Trustee has filed his opening brief over thirty days before it would otherwise be due under Bankruptcy Rule 8018(a)(1).

---

[1] "[#]ER[#]"refers to volume and page numbers, respectively, in Appellant's Excerpts of Record and "Dkt." refers to entries on the bankruptcy court docket.

## INTRODUCTION

The Supreme Court held in *Purdue* that the Bankruptcy Code does not permit bankruptcy courts to involuntarily alter relationships between non-debtors by imposing releases of, or injunctions barring, claims between them. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 209, 227 (2024). But the confirmation order below does exactly that. Instead of acknowledging a release agreement entered between non-debtors, it uses the plan to "deem" the debtors' claim and interest holders to have released their third-party claims, impermissibly altering the relations between non-debtors.

That is wrong. The Supreme Court, on any number of occasions, and bankruptcy courts too, look to state law to determine parties' property rights. There is nothing special about third-party releases that allows chapter 11 plans to violate state-law requirements for consent.

Here, there is no release agreement between non-debtors, other than the "Consenting Stakeholders" who signed a Transaction Support Agreement, discussed further below. For all other claim and interest holders, the confirmation order imposes a third-party release if they fail to respond with an opt-out form or objection. But silence is not consent under state law. The confirmation order thus impermissibly bars claims between non-debtors when a valid release does not exist under state law. It further imposes an injunction to enforce the third-party release without jurisdiction, statutory authority, or any showing that injunctive relief is warranted. Accordingly,

2

the Court should reverse and strike the involuntary third-party release and related injunction from the confirmation order and plan.

## STATEMENT OF APPELLATE JURISDICTION

This Court has jurisdiction to hear this appeal under 28 U.S.C. § 158(a)(1), which grants jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges to district courts.

The bankruptcy court had jurisdiction over the debtors' chapter 11 bankruptcy case under 28 U.S.C. §§ 157(a) and (b), and 1334(a).  For the reasons discussed below, *infra* Parts II, III, the bankruptcy court lacked jurisdiction to enter the injunction provisions enforcing the non-consensual third-party release.  The bankruptcy court's final order confirming the debtors' chapter 11 plan under 11 U.S.C. § 1129 was entered on January 24, 2025 (the "Confirmation Order").  3ER374-522 (Dkt.181).  *See Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015).

The bankruptcy court's order approving, *inter alia*, the debtors' solicitation and notice procedures for the plan was entered on December 23, 2024 ("Solicitation Order").  2ER239-314 (Dkt.81).  That interlocutory order merged into the final confirmation order for purposes of appeal.  *See Perez v. Everett (In re Perez)*, 30 F.3d 1209, 1217 (9th Cir. 1994); *Matter of Tex. Extrusion Corp.*, 844 F.2d 1142, 1155-56 (5th Cir. 1988).

The United States Trustee timely filed a notice of appeal under 28 U.S.C. § 158(c)(2) and Federal Rule of Bankruptcy Procedure 8002 on January 31, 2025. 3ER523-525 (Dkt.209).

## STATEMENT OF THE ISSUES

Did the bankruptcy court err by entering the Confirmation Order and Solicitation Order because Debtors' chapter 11 plan impermissibly extinguishes non-debtors' claims against other non-debtors without their consent?

Did the bankruptcy court err by entering an injunction barring the holders of involuntarily extinguished claims from commencing or continuing any proceeding against other non-debtors?

Did the bankruptcy court err by entering an injunction requiring bankruptcy court authorization before non-debtors can commence or pursue a claim against other non-debtors?

## STATEMENT OF THE CASE

### I.    Statutory Framework

#### A.    Confirmation of Chapter 11 Plans.

Chapter 11 of the Bankruptcy Code allows "a debtor to reorganize its business or financial affairs or to engage in an orderly liquidation of its property either as a going concern or otherwise." 7 Collier on Bankruptcy ¶ 1100.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); 11 U.S.C. §§ 1101 et seq.

4

A plan will typically divide holders of claims against or interests in a debtor into different voting classes based on the nature of the claim or interest, *see* 11 U.S.C. § 1122, and each class will separately vote to accept or reject the plan, *id.* § 1126(c), (d).  Holders of claims against or interests in a debtor that are affected by a proposed plan may vote to accept or reject the plan.  *See id.* § 1126(a).  But a holder of a claim or interest that is left unimpaired by a plan may not vote on it.  *Id.* § 1126(f).  Likewise, a holder of a claim or interest that is not entitled to receive anything under the plan is deemed to reject it and is not entitled to vote on it.  *Id.* § 1126(g).

"The court shall confirm a plan only if it complies with all" of the requirements of section 1129(a), which include that "[t]he Plan complies with the applicable provisions of [the Bankruptcy Code]."  *Id.* § 1129(a).  A chapter 11 plan that imposes nonconsensual releases of, or enjoins, claims held by non-debtors against other non-debtors cannot be confirmed.  *Purdue*, 603 U.S. at 216-227.  Under Fifth Circuit precedent, the plan proponent must prove that it met the requirements for confirmation.  *Heartland Fed. Savs. & Loan, Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993).

## B.    The Role of the United States Trustee

The United States Trustee is an official of the Department of Justice appointed by the Attorney General to supervise the administration of bankruptcy cases.  28 U.S.C. §§ 581–589.  United States Trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena."  H.R. Rep. No.

5

95-595, at 88 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6049.  The United States

Trustee "may raise and may appear and be heard on any issue in any case or

proceeding under this title."  11 U.S.C. § 307.

## II.   Statement of the Facts

### A.   Debtors File Chapter 11 Petitions After Entering a Transaction Support Agreement with Some of Their Creditors.

The Container Store and affiliated companies[2] (collectively, "Debtors") filed

for chapter 11 relief on December 22, 2024.  1ER27-51 (Dkt.1).  They filed a

"prepackaged" case, meaning that they began soliciting votes on their proposed plan

before even filing their chapter 11 petitions.  Debtors' reorganization plan is

essentially a debt for equity transaction with certain creditors.  1ER75-76 (Dkt.6 at 24-

25).

As part of their efforts to accelerate their path through bankruptcy, before

filing their petitions, Debtors entered a Transaction Support Agreement with their

"key stakeholder constituencies."  1ER55 (Dkt.6 at 4).  Debtors' agreement with them

is not at issue in this appeal, but those stakeholders' execution of a written agreement

stands in contrast to the third-party release imposed by the plan.

The parties to the agreement included three equity holders who signed it, called

the "Consenting Stockholder Parties," 1ER85, 97, 152 (Dkt.6-1 at 3, 15, 281); Dkt.58

---

[2] The debtors in these cases are: The Container Store Group, Inc.; The Container Store, Inc. C Studio Manufacturing Inc.; C Studio Manufacturing LLC; and TCS Gift Card Services, LLC.

at 5-7 (filed under seal), as well as certain lenders who signed it, referred to collectively

as the "Consenting Stakeholders," 1ER85 (Dkt.6-1 at 3).  The agreement recites that

"the Parties have agreed to grant the Releases in accordance with this Agreement."

1ER86 (Dkt.6-1 at 4).  The "Releases" are defined as "the releases as set forth and to

be provided pursuant to the Plan as contemplated by the Transaction Term Sheet."

1ER94 (Dkt.6-1 at 12).  Debtors agreed to pay the Consenting Stakeholders a

"Consent Premium," which was "the subject of arm's-length and good faith

negotiations."  2ER349 (Dkt.167 at 49).

### B.    The Plan Extinguishes Non-Debtors' Third-Party Claims Unless They Specifically Opt Out or Object.

 One day after filing their chapter 11 petitions, Debtors filed their proposed

chapter 11 plan.  1ER164-238 (Dkt.19).  Among the plan's complex provisions are a

third-party release and related injunction provisions, described in more detail below.

Only one class of creditors, prepetition term loan claims, was permitted to vote

on the plan.  3ER383 (Dkt.181 at 10).  Most creditors—including holders of general

unsecured claims—were not allowed to vote.  They were deemed to accept the plan

because their claims would "ride through," meaning they would be paid in full in the

ordinary course.  1ER192-194 (Dkt.19 at 29-31); 3ER473 (Dkt.181 at 100).

Thousands of public shareholders also were not allowed to vote because they were

deemed to reject the plan.  1ER195-196 (Dkt.19 at 32-33); 3ER473 (Dkt.181 at 100).

Their equity interests in Debtors were canceled and they received nothing under the plan. 1ER196, 203-204 (Dkt.19 at 33, 40-41); 3ER476 (Dkt.181 at 103).

The third-party release, in Article IX.C of the plan, extinguishes a broad swath of claims against thousands of largely unidentified non-debtors belonging to thousands of other non-debtors unless they opt out of or object to it. The released parties are not paying the releasing parties anything for the third-party release.

The plan defines the "Releasing Parties" to include anyone who holds a claim against, or an interest in, Debtors who does not opt out or object to the third-party release. The definition includes, in part:

> each Holder of a Claim or Interest in a Class (other than Holders of Rejection Damages Claims) that does not affirmatively elect to opt out of the Releases contained in this Plan or that does not (A) timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the Third-Party Release that is not withdrawn or resolved before Confirmation or (B) provide to the Debtors by electronic mail an informal objection and such objection is not withdrawn or resolved before Confirmation.

3ER464 (Dkt.181 at 91).

There are ten categories of claims encompassed by the release, including any claim, "whether known or unknown," "relating to" the management, ownership, or operation of Debtors or their non-debtor affiliates, any purchase or sale of any security of the Debtors or their non-debtor affiliates, and the business or contractual arrangements between any Debtor or non-debtor affiliate and any other entity. 3ER424-425, 506-607 (Dkt.181 at 51-52, 133-34). The list of released claims includes

at least a dozen defined terms that require cross-referencing various definitions in the plan to understand. *Id.*

There are thirteen categories of "Released Parties" who may no longer be sued, mostly identified using defined terms that, again, require cross-referencing various definitions in the plan to understand. The "Released Parties" are defined as:

(1) "each Debtor";

(2) "each Reorganized Debtor";

(3) "each Non-Debtor Affiliate";

(4) "each of the Debtors' and Non-Debtor Affiliates' current and former directors and officers";

(5) "each Consenting Stakeholder";

(6) "each Prepetition Agent";

(7) "each DIP Agent";

(8) "each DIP Term Lender";

(9) "the DIP ABL Lender";

(10) "each Exit Facility Agent";

(11) "each lender under the Exit Facilities";

(12) "each Releasing Party"; and

(13) "each Related Party of each Entity" included in the list above.

3ER464 (Dkt.181 at 91). "Related Parties" are defined to include, among others, an entity's "employees, agents, trustees, advisory board members, financial advisors, attorneys . . . , accountants, investment bankers, consultants" and "any such Person's

or Entity's respective heirs, executors, estates, and nominees." 3ER463-464 (Dkt.181 at 90-91).

Notably, the Released Parties include the broad universe of "each Releasing Party." 3ER464 (Dkt.181 at 91). Although we now know that this includes upwards of 15,000 claim and interest holders, 2ER372-373 (Dkt.179 at 2-3), it could not be known until after the due date for ballots and opt-out forms who would ultimately be deemed a Releasing Party and therefore also a Released Party. Even now, post-confirmation, that information is not publicly available as the declaration describing who opted out does not identify most claimants by name. 2ER341-343 (Dkt.164 at 20-22).

In addition to "deem[ing]" the Releasing Parties to have released all of these claims against thousands of non-debtors, the Confirmation Order and Article IX.E of the plan also includes an injunction that does two important things.

First, it bars any claim "released or to be released" under the plan or Confirmation Order. 3ER426-427, 508-509 (Dkt.181 at 53-54, 135-36). It provides that "from and after the Effective Date, all Persons and Entities are . . . permanently enjoined from":

> (1) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind;
>
> (2) enforcing, attaching, collecting, or recovering in any manner or means any judgment, award, decree, or order;
>
> (3) creating, perfecting, or enforcing any Lien or encumbrance;

(4) asserting a right of setoff or subrogation of any kind; or

(5) commencing or continuing in any manner any action or other proceeding of any kind,

with respect to a released claim against anyone released under the plan.  3ER426, 508 (Dkt.181 at 53, 135).

Second, it includes a gatekeeping provision requiring pre-authorization by the bankruptcy court before a Released Party can be sued by *anyone* on a set of claims even broader than those encompassed by the third-party release—the only condition is that the claim "is reasonably likely to relate to" an act or omission that in turn "relate[s] to" a released claim.  3ER427, 508-509 (Dkt.181 at 54, 135-136).  The injunction provides that "No Person or Entity may commence or pursue" any such claim against a Released Party "without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such . . . Released Party."  3ER427, 508 (Dkt.181 at 54, 135).  During this gatekeeping proceeding, if a party requests it, the bankruptcy court "shall . . . direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy

Court shall assess before making a determination." *Id.* The Confirmation Order requires further bankruptcy court approval "before filing" any amendment to a previously authorized complaint "in the court where such complaint or petition is pending." *Id.*

### C.  The Same Day Debtors File Their Plan, the Court Approves Their Proposed Solicitation and Opt-Out Procedures.

In the twenty-four hours after filing their chapter 11 petitions, Debtors filed thirteen emergency motions as well as their proposed plan and a related disclosure statement.  1ER2-5 (Dkt. Nos. 2, 4, 5, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17).

Among those thirteen emergency motions was a 115-page motion to approve, among other things, Debtors' proposed solicitation and notice procedures for the plan that they had filed earlier that day.  1ER4-5 (Dkt. Nos. 17, 19).  Those procedures included Debtors' proposal to bind claimants to the plan's third-party release unless they opt out.  1ER156, 158, 160-163 (Dkt.17 at 4, 10, 12-15).  Debtors proposed to send the notices on December 24, 2024.  1ER156 (Dkt.17 at 4).

The bankruptcy court heard the solicitation motion at 1 pm the same day it was filed.  1ER11 (Dkt. No. 84).  The United States Trustee objected at the hearing to the way opt outs were being used and preserved his objections for plan confirmation.  3ER527-528 (Tr. at 50-51).

Later that day, the bankruptcy court entered the Solicitation Order approving the solicitation and notice procedures.  2ER239-314 (Dkt.81).  The order gave parties

roughly one month to object to the plan and to return a ballot or opt-out form. 2ER242 (Dkt.81 at 4). It also set a combined hearing for final approval of the disclosure statement and confirmation of the plan on 1 p.m. on January 24, 2025. 2ER241-242 (Dkt.81 at 3-4).

The solicitation and noticing procedures included three parts: (1) the solicitation package sent prepetition to the one class entitled to vote on the plan; (2) the "Combined Notice" sent post-petition to all claim and interest holders; and (3) the "Notice of Non-Voting Status" sent post-petition to those not entitled to vote on the plan.

First, before Debtors' petition was filed, they sent a solicitation package to the only class entitled to vote on the plan. 1ER156, 157-158 (Dkt.17 at 4, 9-10). That package included the disclosure statement, the proposed plan, and a ballot with voting instructions. 1ER157-158 (Dkt.17 at 9-10). The ballot included a box that could be checked to opt out of the third-party release. 1ER158 (Dkt.17 at 10). The ballots stated that members of the voting class "will be bound by the injunction and exculpation provisions contained in Article IX of the Plan and set forth in Appendix A." 2ER265 (Dkt.81 at 27). It further stated that "if [they] do not opt out" they "will be deemed to have granted" the third-party release. *Id.*

Second, Debtors sent to all holders of claims and interests the Combined Notice, which included the date of the confirmation hearing, objection procedures, and information on how the disclosure statement and plan can be viewed

13

electronically.[3]  1ER160-262 (Dkt.17 at 12-13).  The Combined Notice states that, other than the one class of loan claims, no one is entitled to vote on the plan, which "provides for certain releases, injunctions, and exculpations as set forth in Appendix A."  2ER250 (Dkt.81 at 12).  Appendix A included the text of the release and injunction provisions but not the definitions.  2ER256-261 (Dkt.81 at 118-23).

Third, Debtors sent the Non-Voting Status Notice to the "Non-Voting Classes," including the general unsecured creditors deemed to accept the plan and the equity holders deemed to reject the plan.[4]  1ER162 (Dkt.17 at 14).  This notice was titled "Non-Voting Status Notice" and stated on page 1: "you are receiving this notice as a Holder or potential Holder of a Claim against or Interest in one or more of the Debtors that, due to the nature and treatment of such Claim or Interest under the Plan, *is __not__ entitled to vote on the Plan*."  2ER280 (Dkt.81 at 42) (emphasis in original).  The following page stated that "the Plan contains certain release, exculpation, and injunction provisions, set forth in Appendix A" and "if you do not opt out of granting the Third-Party Release by following the instructions contained in the attached Release Opt-Out Form, you will automatically be deemed to have consented to the Third-Party Release set forth in Article IX.C of the Plan."  2ER281,

---

[3] For the "millions of" consumer customers, however, this notice was provided only via publication.  1ER162 (Dkt.17 at 14); 2ER315-321 (Dkt.117).

[4] Debtors did not send these notices to classes 6 and 7 because those claims and interests were all held by Debtors or their affiliates.  2ER324 (Dkt.164 at 3).

303 (Dkt.81 at 43, 65).  The notice did not include the disclosure statement or plan. Instead, it told Non-Voting Classes they could visit a website to view those documents.  2ER281 (Dkt.81 at 43).

The Release Opt-Out Form included similar statements about the third-party release, 2ER289-295 (Dkt.81 at 51-57), and stated "you will be deemed to have granted the releases contained in Article IX.C of the Plan" unless the form is received by 4 p.m. January 21, 2025, 2ER292, 305 (Dkt.81 at 54, 67).  The form also states: "All questions as to the validity, form, eligibility (including time of receipt), and acceptance and revocation of an opt-out election will be resolved by the Debtors or Reorganized Debtors (as applicable), in their sole discretion, which resolution will be final and binding."  2ER292, 306 (Dkt.81 at 54, 68).

Like those who received ballots, the Non-Voting Classes were not asked to agree to the releases, but rather informed that they would be "deemed to have granted" them if they did opt out or object.  2ER292, 305 (Dkt.81 at 54, 67).  And they were not given an option to opt out of the plan's injunction provisions.  2ER290, 291, 292, 294, 303, 304, 305, 307 (Dkt.81 at 52, 53, 54, 56, 65, 66, 67, 69) (all referring only to the possibility of opting out of "the Third Party Release" in Article IX.C of the plan).

Neither the Combined Notice nor the Non-Voting Status Notice stated who was being released by the third-party release.  *See* 2ER248-261, 279-314 (Dkt.81 at 10-23, 41-76).  To learn who was being released, claim and interest holders would have to

15

look up the plan online and find its definition of a "Released Party," and the dozen other defined terms embedded within the "Released Party" definition. *See* 2ER281 (Dkt.81 at 43); 3ER464 (Dkt.181 at 91).

### D. The Bankruptcy Court Confirms the Plan Over the United States Trustee's and the SEC's Objections.

The United States Trustee and the SEC both objected to confirmation based on the plan's inclusion of an impermissible third-party release and related injunction provisions and argued, among other things, that there was not consent to the third-party release under state law.[5] Dkt. 150, 152. The United States Trustee also objected to Debtors' request to waive the automatic 14-day stay of the Confirmation Order under Bankruptcy Rule 3020(e). Dkt. 150 at 34.

At the January 24, 2025, confirmation hearing, the evidence showed that the balloting agent received back less than 1% of the 16,968 opt-out forms that it served on the Non-Voting Classes. 2ER372-373 (Dkt.179 at 2-3). The balloting agent received a total of 165 opt-out forms, including 147 of the 13,068 forms sent to general unsecured claim holders and 15 of the 3,852 forms sent to equity interest holders. *Id.* In addition, 297 opt-out forms were returned as non-deliverable. 2ER372 (Dkt.179 at 2). And 24 claim and interest holders returned opt-out forms but

---

[5] The SEC is statutorily prohibited from appealing. 11 U.S.C. § 1109(a).

"did not elect to opt-out"—meaning, presumably, they did not check the box. 2ER343 (Dkt.164 at 22).

At the confirmation hearing, the bankruptcy court stated that "if we were writing on a blank slate, I think that [United States Trustee's] arguments [about consent] would be fairly persuasive, but we're not writing on a blank slate." 3ER536 (Tr. at 41). It explained that the bankruptcy court's consistent view had been that "giving the opportunity for the Debtors [sic] to opt out is consistent with having consensual third-party releases." 3ER536-67 (Tr. at 41-42). According to the bankruptcy court, "the major goal and the major inquiry that the Court has to make is: Was this a process that was fair and that it was intended to get notice to people, so that they could make a decision?" 3ER536 (Tr. at 42). The court did not cite any cases or explain the basis for concluding that this process constitutes consent under either federal or state law.

The bankruptcy court also approved the plan's injunction provisions. It stated it did not believe "the use of the injunction to support a consensual release is in any way prohibited by the case law, either by *Purdue* or in the Fifth Circuit." 3ER538 (Tr. at 43). "[S]imilarly, the gatekeeping function, again, *Highland Capital* [48 F.4th 419 (5th Cir. 2022)] permits the gatekeeping function with respect to the exculpated parties, which, in this case, is only the Debtor, as well as the parties that are released." *Id.*

Finally, the court waived Bankruptcy Rule 3020(e)'s automatic 14-day stay of the Confirmation Order. 3ER402, 422 (Dkt.181 at 29, 69). The United States

17

Trustee filed an emergency motion for a stay pending appeal, but the bankruptcy court denied emergency treatment of that motion.  1ER25-26 (Dkt. Nos. 210, 213).  A hearing on the stay motion has been scheduled for March 11, 2025.  1ER26.

The bankruptcy court entered the Confirmation Order on January 24, 2025.  ER374 (Dkt.181).  The United States Trustee timely appealed on February 3, 2025.  3ER523-525 (Dkt.209).

## SUMMARY OF THE ARGUMENT

The Confirmation Order deprives thousands of people of their right to sue thousands of mostly unidentified non-debtors.  Fewer than 1% of nearly 17,000 claim and interest holders returned the form necessary to opt out of the third-party release.  2ER372-373 (Dkt.179 at 2-3).  The order not only imposes a nonconsensual third-party release and enjoins the released claims, it also requires *anyone* with a claim "reasonably likely to relate to" a released claim to obtain permission from the bankruptcy court before suing.  The extent of the released and enjoined claims is unknowable but broadly includes, for example, claims relating to the debtors' or their non-debtor affiliates' business such as claims against their employees for workplace harassment, *see, e.g.*, Complaint, *Menor v. The Container Store, et al.*, No. 24STCV213333 (Cal. Super.) (filed July 30, 2024).

Failing to apply the right legal standard, the bankruptcy court erroneously concluded that it could "deem" consent to the third-party release.  But whether a non-

debtor has consensually released a claim against another non-debtor is governed by state law.  Under state law, the third-party release imposed here is not consensual.

A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law.  A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code.  If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

No provision of the Bankruptcy Code preempts state law on this question.  No Code provision defines when non-debtors have consented to release claims against each other.  Thus, applicable state law governs whether there is valid consent to a third-party release.  The bankruptcy court did not find, and Debtors did not argue, that such consent exists here under Texas (or any other state's) law.  Nor would any such argument have merit.  Under black-letter contract law, silence is not consent except in narrow circumstances inapplicable here.

The bankruptcy court deemed the third-party release consensual because Debtors' claim and interest holders received notice of it and failed to opt out or object.  But silence is not consent under applicable state law.  That is particularly so when material terms, like who was being released, were not included in the notices sent to claimants.

Nor can it be justified by analogy to the forfeiture of rights when litigants do not object. That is nothing more than a back door to imposing the nonconsensual third-party releases prohibited by *Purdue*. When parties fail to timely respond in litigation, they are not bound because they have consented to the resulting court order, but because of the forfeiture rules that apply to litigating parties. And litigation default rules do not permit relief that is not potentially available in contested litigation.

Debtors' argument based on class-action settlements likewise lacks merit. The Supreme Court has held that "[c]ourts may not 'recognize a common-law kind of class action' or 'create *de facto* class actions at will.'" *United States v. Sanchez-Gomez*, 584 U.S. 381, 389 (2018) (cleaned up). And a class-action settlement is binding not because the class members have consented to it but because members of a certified class action are considered parties for purposes of being bound by the class-action judgment.

If the third-party release falls, the injunction enforcing it falls, too. But the injunction is also erroneous for additional reasons. First, the court lacked jurisdiction to enter the injunction under 28 U.S.C. § 1334(b) because the enjoined claims between non-debtors are not "related to" Debtors' bankruptcy case. The court also lacked jurisdiction because Debtors had no standing to seek this injunctive relief. Standing to seek injunctive relief requires a real and immediate threat of irreparable injury, which is lacking here. Second, there is no authority in the Bankruptcy Code for the court to enjoin claims between non-debtors. Finally, injunctive relief was not warranted under the traditional factors governing injunctions.

20

For these reasons, this Court should reverse and strike the involuntary third-party release and related injunction from the Confirmation Order and plan. *See Nexpoint Advisers, L.P. v. Highland Cap. Mgmt. L.P. (In re Highland Cap. Mgmt. L.P.)*, 48 F.4th 419, 431 (5th Cir. 2022) ("[T]he court may fashion the remedy it sees fit without upsetting the reorganization.").

## STANDARD OF REVIEW

This Court reviews a bankruptcy court's factual findings for clear error and legal conclusions *de novo*. *Highland Cap.*, 48 F.4th at 429.

## ARGUMENT

### I.    Failure to Opt Out Is Not Consent to a Third-Party Release.

The bankruptcy court erred in entering the Confirmation Order because Debtors' plan impermissibly imposes a third-party release without valid consent under applicable state law. For the same reasons, the court erred in hastily approving the Solicitation Order approving these opt-out procedures.[6]

### A.    State Law Governs Whether Parties Have Agreed to a Release.

"[T]he basic federal rule in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979).

---

[6] Although the Solicitation Order is erroneous, that does not necessarily mean Debtors' plan must be resolicited. Rather, the imposition of the third-party release can be remedied by striking the offending provisions from the Confirmation Order and plan. *Highland Cap.*, 48 F.4th at 431.

Thus, courts apply state law when the question is whether a debtor has entered a valid settlement agreement. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

The rule is no different for third-party releases. They are separate agreements between non-debtors governed by state law. Unlike a debtor's bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the creditor agrees to do so." *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997). Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *Id.*

There is no Bankruptcy Code provision that preempts this otherwise applicable state contract law. *See, e.g.*, *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

22

The Bankruptcy Code does not define a "consensual third-party release." *See* 11 U.S.C. § 101. *Accord* 11 U.S.C. § 1101 (providing additional definitions for chapter 11 cases). "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). And no Code provision authorizes courts to "deem" a non-debtor to have consented to a release when such consent would not otherwise exist as a matter of state law.

Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223). Accordingly, "any such consensual agreement would be governed by state law." *Id.* *See also In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007) ("The validity of a consensual release is primarily a question of contract law because such releases are no different from any other settlement or contract."); *accord In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017); *see also Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022); *In re Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024); *Arrowmill*, 211 B.R. at 506, 507.

**B.    Under State Law, Indeed Under Black-Letter Contract Law, Silence Is Not Acceptance.**

Debtors bear the burden to prove that their plan is confirmable. *Briscoe Enters.*, 994 F.2d at 1164-65. They failed to meet this burden with respect to the third-party release provisions because they failed to establish that the third-party release is consensual under state law.

Dispositively, the bankruptcy court did not find, and Debtors never contended, that a failure to opt out constitutes consent to the third-party release under state contract law. *See* 2ER351-359, 363-367 (Dkt.167 at 56-64, 85-89); 3ER387-388, 535-538 (Dkt.181 at 14-15; Tr. at 40-43). And any such contention would lack merit.

Under Texas law, as in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement.[7] *See, e.g., Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 133 (Tex. 2000) ("[A] unilateral offer . . . is binding only if the [offeree] accepted it."); *Beverick v. Koch Power, Inc.,* 186 S.W.3d 145, 150 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("The elements of a valid contract are: (1) an offer, (2) an acceptance, (3) a

---

[7] While the Plan provides that it is governed by New York law, Debtors cannot choose the law to apply to contracts between non-debtors and they did not argue below that New York law applies to determine whether the third-party release is consensual. *See* 2ER351-359, 363-367 (Dkt.167 at 56-64, 85-89). In any event, no one has suggested there would be a different outcome under New York or any other jurisdiction's law, so no choice of law is required. *See, e.g., Aggreko, L.L.C. v. Chartis Specialty Ins. Co.*, 942 F.3d 682, 697 (5th Cir. 2019); *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 53 (Tex. 2008).

meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding."); RESTATEMENT (SECOND) OF CONTRACTS § 17(1) (1981) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration.").

A failure to affirmatively opt out is nothing more than a non-response. But a party's "[s]ilence cannot satisfy the basic requirements of contract creation." *Beverick*, 186 S.W.3d sy 152; *see also Matagorda Cty.*, 52 S.W.3d at 132 ("[A]s a general rule, silence and inaction will not be construed as an assent to an offer.") (cleaned up); RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981)[8] ("Ordinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); *accord The Levin Law Grp., P.C. v. Sigmon*, No. 14-08-01165-CV, 2010 WL 183525, at *3 (Tex. App. 2010); *Texas v. Triax Oil &*

---

[8] Texas, like many states, follows the RESTATEMENT (SECOND) OF CONTRACTS § 69. *See, e.g., Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 52 (Tex. 2008); *The Levin Law Grp., P.C. v. Sigmon*, No. 14-08-01165-CV, 2010 WL 183525, at *3 (Tex. App. 2010); *Texas v. Triax Oil & Gas, Inc.*, 966 S.W. 2d 123, 128 (Tex. App. 1998).

*Gas, Inc.*, 966 S.W. 2d 123, 128 (Tex. App. 1998); 1 CORBIN ON CONTRACTS § 3.19 (2018); 4 WILLISTON ON CONTRACTS § 6:67 (4th ed.).

There are only "narrow exceptions" to the rule that silence does not equate to consent. *Matagorda Cty.*, 52 S.W.3d at 132. These include when the offeree accepted offered services with a reasonable opportunity to reject them and when there has been a prior course of dealing that evidences a meeting of the minds. *See In re Couture Hotel Corp.*, 554 B.R. 369, 385 (Bankr. N.D. Tex. 2016); *Matagorda Cty.*, 52 S.W.3d at 132; *Frank's Casing*, 246 S.W.3d at 52; *The Levin Law Grp.*, 2010 WL 183525, at *4. *See also* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. ("[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds.").

But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c.

Thus, the "mere failure to object" to an offer cannot "establish an agreement between the parties." *Matagorda Cty.*, 52 S.W.3d at 132 (cleaned up); *see also id.* at 133

26

(holding an offeree's "silence in response to" an offer "cannot support an implied agreement"). Merely establishing that notice was provided of an offer and that the offeree failed to object does not establish that the offeree agreed to it. *See Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 665 S.W. 2d 443, 445 (Tex. 1982) ("[T]he mere failure to object within a reasonable time to [a proposed contract term], without more, could not establish an agreement between the parties."); *The Levin Law Grp.*, 2010 WL 183525, at *4 (holding lack of objection did not indicate acceptance); *Couture Hotel*, 554 B.R. at 384-85 (holding that while the evidence established notice of a claimant's intent to charge the debtor, the debtor's failure to object did "not establish that [the debtor] ever agreed to pay these charges").

As the Fifth Circuit has explained: "Tacit acquiescence between relative strangers ignores the basic tenets of contract law. . . . While there may be exceptions in cases involving parties with longstanding relationships, generally speaking, 'silence or inaction does not constitute acceptance of an offer.'" *Imperial Ind. Supply Co v. Thomas*, 825 F. App'x 204, 207 (5th Cir. Sept. 2, 2020) (quoting *Norcia v. Samsung Telecomms Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017)). As another district court within this Circuit explained, "[t]his idea that [the plaintiff] can unilaterally bind another party to a contract, however, is contrary to law. It is a fundamental principle of contract law that to create an enforceable contract, there must be a clear and definite offer followed by a clear and definite acceptance in accordance with the offer's terms." *Redmond v. Williams*, No. 22-cv-00910, 2023 WL 7984388, at *6 (E.D.

27

Tex. Sept. 13, 2023). Acceptance of an offer "is established only by conforming to the rules governing acceptance, not a separate theory of 'waiver and ratification.'" *Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir. 1981).

### C.    Remaining Silent by Failing to Opt Out Does Not Constitute Acceptance of an Offer to Release Claims Against Non-Debtors Under State Law.

Debtors' plan imposes a third-party release on all claim and interest holders unless they opt out or object. In other words, Debtors purport to impose an otherwise non-existent duty to speak on claimants regarding a unilateral offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent. But under black-letter law that silence is not acceptance of the offer to release non-debtors. *See supra* Part I.B; *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

A case from the Ninth Circuit illustrates the point. In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Fifth Circuit in *Imperial Ind. Supply*, 825 F. App'x at 207, the court held that a failure to opt out did not constitute consent to an arbitration agreement. A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. The phone came with a Samsung warranty brochure that contained an

arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage. *Id.*

When Samsung attempted to enforce the arbitration provision, the Ninth Circuit applied the "general rule" that "silence or inaction does not constitute acceptance of an offer." *Norcia*, 845 F.3d at 1284 (cleaned up). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Id.* at 1285 (cleaned up). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id.* at 1286 (cleaned up).

The Ninth Circuit held that none of the exceptions to this rule applied. *Norcia*, 845 F.3d at 1284-85. There was no state-law duty to respond to the offer, the parties had no prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied even if he opted out of arbitration. *Id.* at 1286.

Here, too, other than the Consenting Stakeholders who signed the Transaction Support Agreement, claimants have not signed an agreement to release their claims against the Released Parties. Nor does their silence manifest an intention to accept an

offer to release non-debtors. Claim and interest holders have no legal duty to vote on

a plan, much less to respond to an offer to release non-debtors included in a plan

solicitation, such that their silence constitutes consent to a third-party release.[9] *See,*

*e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison*,

576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan

that would allow a court to infer consent to third-party releases from silence). Nor

have they had any prior course of dealing with the thousands of released non-debtors

that would impose such a duty. And they have not retained (or received) any benefits

from those non-debtors in exchange for the release that would create a duty to speak.

Indeed, the equity holders are being wiped out. 1ER196, 203-204 (Dkt.19 at 33, 40-

41); 3ER476 (Dkt.181 at 103). Even where there are conspicuous warnings that a

party will be bound if they remain silent, that is not sufficient to recast a party's

silence as consent to a third-party release. *See SunEdison*, 576 B.R. at 458–61; *Couture*

*Hotel Corp.*, 554 B.R. at 384-85; *Matagorda Cnty.*, 52 S.W.3d at 132; *Triton Oil & Gas*,

665 S.W. 2d at 445; *The Levin Law Grp.,* 2010 WL 183525, at *4.

---

[9] Whether someone is entitled to vote on a chapter 11 plan depends on how the plan treats their claims against and interests in the debtor. 11 U.S.C. § 1126(a), (f), (g). The Bankruptcy Code requires that for a chapter 11 plan to be confirmed it must be approved by each impaired class, but it may be confirmed if not all classes accept "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *See* 11 U.S.C. § 1129(a)(8), (b).

### 1. A Failure to Opt Out by Those Who Did Not Vote Is Not Consent to a Third-Party Release.

The Confirmation Order imposes the third-party release on over 15,000 members of the Non-Voting Classes who did not return an opt-out form. 2ER372-373 (Dkt.179 at 2-3). But a third-party release cannot be imposed on those who do not vote and do not opt out. *See Smallhold*, 2024 WL 4296938, at *2; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). Those who do not vote cannot be said to be consenting to anything—they are taking no action with respect to the plan. As discussed above, none of the exceptions to the rule that silence is not consent applies.

There are myriad reasons that parties may not have returned an opt-out form other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. This is especially true for the over 15,000 non-voting claim and interest holders here, whose votes were not solicited, but who were instead sent a notice informing them they are "***not entitled to vote on the Plan.***" 2ER280 (Dkt.81 at 42) (emphasis in original). Assuming they even received the Non-Voting Status Notice—over 200 were returned as undeliverable, 2ER372 (Dkt.179 at 2)—having been clearly told they have no right to vote because they were being paid in full or not at all, claim and interest holders may not have continued reading to see the following page's statement that they will be "deemed" bound by a third-party release if they do not return an opt-out form. 2ER281, 303 (Dkt.81 at 43, 65). And, even if they saw this part of the notice, they

may not have understood what the third-party release meant or who was being released, particularly given that neither the Combined Notice nor the Non-Voting Status Notice stated who was being released.  *See* 2ER248-261, 279-314 (Dkt.81 at 10-23, 41-76).  To learn that, claim and interest holders would have to look up the plan online and find its definition of a "Released Party," and the dozen other defined terms embedded within the "Released Party" definition.  *See* 2ER280 (Dkt.81 at 42); 3ER464 (Dkt.181 at 91).  The fact that 24 people sent back the Opt-Out Form without checking the box suggests that not everyone understood it.  2ER343 (Dkt.164 at 22).

The bankruptcy court's assumption that anyone who did not return an opt-out form made a considered decision to agree to the release in these circumstances is nonsensical.  "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point."  *Chassix*, 533 B.R. at 81.  "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to

being given away through the debtor's bankruptcy."[10]  *Smallhold*, 2024 WL 4296938, at

*12.  "A party's receipt of a notice imposing an artificial opt-out requirement, the

recipient's possible understanding of the meaning and ramifications of such notice,

and the recipient's failure to opt-out simply do not qualify" as consent.  *Emerge Energy

Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019)

(emphasis in original).  "[B]asic contract principles" require affirmative assent, not

inferences drawn from inaction that in fact may reflect only "[c]arelessness,

inattentiveness, or mistake."  *Id.*

A bankruptcy court in Delaware elucidated the point with a hypothetical: a

chapter 11 plan requiring that any creditor that did not "check an 'opt out' box on a

ballot . . . make a $100 contribution to the college education fund for the children of

the CEO of the debtor."  *Smallhold*, 2024 WL 4296938, at *2.  As the *Smallhold* court

observed, "no court would find that in these circumstances, a creditor that never

returned a ballot could properly be subject to a legally enforceable obligation to make

the $100 contribution."  *Id.*  None of the cases that allow imposing a non-debtor

release based on a failure to opt out "provides any limiting principle that would

distinguish the third-party release from the college education fund plan."  *Id.*

---

[10] As discussed further below, *infra* n.11, although the United States Trustee agrees
with much of the analysis in *Smallhold*, he disagrees with its conclusion that voting on
a plan combined with a failure to opt out constitutes consent.

Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *Washington Mut., Inc.*, 442 B.R. at 355; *see also Chassix*, 533 B.R. at 81–82.

### 2. A Failure to Opt Out by Those Who Voted on the Plan Is Not Consent to a Third-Party Release.

Contract law likewise does not support imputing consent to a third-party release based on a failure to opt-out by those who vote on the plan. In contrast to the Consenting Stakeholders who signed the Transaction Support Agreement, there was no express agreement to the third-party release by these claimants. And none of the exceptions to the rule that silence is not acceptance of an offer applies. There was no prior course of dealing nor any acceptance of services that would manifest consent. *See Couture Hotel Corp.*, 554 B.R. at 385; *Matagorda Cty.*, 52 S.W.3d at 132; *Frank's Casing*, 246 S.W.3d at 52; *The Levin Law Grp.*, 2010 WL 183525, at *4; Restatement (Second) of Contracts § 69 cmt. a.

The fact that someone has voted on the plan does not change the analysis because the failure to opt out is still merely silence with respect to the third-party release. "The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," Restatement (Second) of Contracts § 69 cmt. a—in this case, the freedom to vote on a chapter 11 plan. Nor does it "impose on him any duty to speak," *id.*, such as checking an opt-out box when exercising the right

34

to vote on a plan.  Just like the hypothetical creditors in *Smallhold* should not be forced to contribute $100 to a college fund merely because they failed to return a ballot that had an opt-out box, *Smallhold*, 2024 WL 4296938, at *2, creditors who cast such a ballot should not be forced to make such a contribution merely because they failed to check that opt-out box.[11]  Exercising the right under the Bankruptcy Code to vote on a plan while failing to opt out of a third-party release cannot be equated with affirmative conduct manifesting consent to the third-party release.

### D.    The Bankruptcy Court's Default Theory of Consent Fails.

Declining to apply state contract law to determine whether there is consent to the third-party release, the bankruptcy court devised a novel test, styled as its "major inquiry": "Was this a process that was fair and that it was intended to get notice to people, so that they could make a decision?"  3ER536 (Tr. at 42).

The court cited no state or federal law suggesting that this is the correct test for consent.  3ER536 (Tr. at 42).  In a prior case, however, a bankruptcy court in this

---

[11] Despite the force of this example, the *Smallhold* court held that, although a failure to opt out is not consent when a party does not vote, it is consent by someone who votes either to accept or reject a plan.  *See Smallhold*, 2024 WL 4296938, at *14.  The *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release.  *Id.* at *14.  But while voting is an "affirmative step" with respect to a debtor's plan, it is neither an affirmative acceptance of the third-party release nor is it a "*manifestation of intention* that silence may operate as acceptance" of the third-party release.  Restatement (Second) of Contracts § 69 cmt. a (emphasis added).

35

district cited *In re Arsenal Intermediate Holdings, L.L.C.*, No. 23-10097 (CTG), 2023 WL 2655592, at *6–8 (Bankr. D. Del. Mar. 27, 2023), for the proposition that "[t]here is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan."[12] *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024). "The rationale of *Arsenal* was that creditors that did not object to or opt out of a third-party release could essentially be 'defaulted,' with the release being imposed on them, despite their silence, on that basis." *Smallhold*, 2024 WL 4296938, at *8. The bankruptcy court's reasoning here appears to be similar: so long as the creditors received notice of the proposed non-debtor release, there is no unfairness from binding them to it if they did not take action to opt out or object. 3ER536 (Tr. at 42).

This is flawed reasoning. Indeed, the court that decided *Arsenal* has since expressly abrogated that decision. *Smallhold*, 2024 WL 4296938, at *8.

First, when a party is defaulted in litigation for failure to make a timely filing, it is not because the defaulting party has *consented* to an adverse ruling. Rather, "failure

---

[12] *Robertshaw* also cited *Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*, 597 B.R. 597, 608–09 (S.D. Tex. 2019). *Robertshaw*, 662 B.R. at 323. But the basis for the decision in *CJ Holding* was *res judicata*. 597 B.R. at 606. As the Fifth Circuit has explained, *res judicata* is irrelevant to the question of whether a final order *which is being appealed* is erroneous. *See Bank of NY Trust Co., NA v. Official Unsecured Creditors Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 252 n.27 (5th Cir. 2009) ("[T]hese cases are distinguishable because they concern the *res judicata* effect of non-debtor releases, not their legality. . . . The current case is distinguishable because it presents an appeal of a confirmation order, not a separate action . . . collaterally attacking the legality of the release.").

36

to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right.  *United States v. Olano*, 507 U.S. 725, 731 (1993).  Forfeiture, unlike waiver, is not an *intentional* relinquishment of a known right.  *Id.* at 733.  *Cf. Smallhold*, 2024 WL 4296938 at *9 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way.  It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

Second, there is no basis to hold that creditors have forfeited claims against non-debtors based on their silence in response to a debtor's chapter 11 plan when those non-debtor claims had not been submitted to the bankruptcy court for adjudication.  *See Olano*, 507 U.S. at 731.

Third, "[u]nder established principles," courts may enter relief against a party who fails to respond "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation.  *Smallhold*, 2024 WL 4296938, at *2, *13; *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

But a third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."  *Smallhold*, 2024 WL 4296938, at *2.  "It is unlike the listed cure amount where one can properly impose on a creditor

37

the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id.* That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no authority to order a release of claims against third parties. Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id.* at *10.

Because *Purdue* establishes that a nonconsensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id.* at *2. And other than the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *Id.* Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required. *Id.* at *11 (emphasis added).

### E. Debtors' Class-Action Analogy Contravenes Supreme Court Precedent.

At the confirmation hearing, Debtors argued that imposing releases on those who do not opt out is appropriate because "there is federal court practice that deems

38

consent based on a proper process, including, but not limited to class actions."[13] 3ER532 (Tr. at 32). This analogy to class actions fails.

The Supreme Court has unanimously admonished: "[C]ourts may not 'recognize a common-law kind of class action' or 'create *de facto* class actions at will.'" *United States v. Sanchez-Gomez*, 584 U.S. 381, 389 (2018) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 901 (2008)) (cleaned up). And it has consistently rejected attempts to apply class-action rules to non-class actions that allegedly were "sufficiently similar" to class actions. *See, e.g.*, *Sanchez-Gomez*, 584 U.S. at 387, 390; *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013). There is no such thing as a "functional class action" that can preclude claims "outside the formal class action context." *Sanchez-Gomez*, 584 U.S. at 389-90. Bankruptcy courts thus cannot unilaterally transplant Rule 23(b)(3)'s class-action opt-out procedure to impose third-party releases in violation of state law.

Importantly, consent is not the reason why class members are bound by a court-approved class-action settlement. Rather, once a class has been certified its members "are considered parties to the litigation in many important respects" and "may be bound by the *judgment*." *Sanchez-Gomez*, 584 U.S. at 387 (cleaned up; emphasis added); *accord Sosna v. Iowa*, 419 U.S. 393, 399 n.8 (1975). This is equally true for both adverse judgments after trial and judgments entered on a court-approved

---

[13] The *Robertshaw* court also cited class-action law in support of binding bankruptcy claimants to third-party releases if they do not opt out. *Robertshaw*, 662 B.R. at 323 n.120.

class-action settlement. *See, e.g.*, *Sosna*, 419 U.S. at 399 n.8. As one court explained, "people who fail to respond to class action notices are bound because that is the legal consequence that the Rule specifies, and not on the theory that their inaction is the equivalent of an affirmative joinder in an action." *Chassix*, 533 B.R. at 78.

Indeed, "the comparison to class action litigation highlights the impropriety of finding releases consensual based merely on a failure to opt out" because in class actions, unlike chapter 11 plan confirmations, "courts must ensure that the class action complies with the unique requirements of Rule 23." *Patterson*, 636 B.R. at 686.

The requirements to certify a class action are many and rigorous to ensure due process to those who are bound by litigation conducted by their class representative. For any class to be certified, a court must find that: there are questions of law or fact common to the class; the class representative's claims are typical of the class's claims; and the class representative "will fairly and adequately protect the interests of the class." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23). Moreover, the court must appoint class counsel that can best "represent the interests of the class." Fed. R. Civ. P. 23(g).

For Rule 23(b)(3) class actions—the only kind for which opt outs are permitted, *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011)—a court must also find both that the common questions "predominate" over individual questions and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

40

Further, class-action settlements require court approval to "protect[] unnamed class members from unjust or unfair settlements affecting their rights." *Amchem*, 521 U.S. at 623. Approval may only be granted if, after a hearing, the court finds the settlement is "'fair, reasonable, and adequate' taking into account whether '(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other.'" *Patterson*, 636 B.R. at 687 (quoting Fed. R. Civ. P. 23(e)(2)).

"None of these protections exist in the context of a non-debtor release in a bankruptcy action." *Patterson*, 636 B.R. at 686. "[N]o party litigates on behalf of the absent releasing party." *Id.*; *see also Smallhold*, 2024 WL 4296938, at *12 n.53. And "[n]o party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent releasing party." *Patterson*, 636 B.R. at 686. "Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead." *Id.* If a mere failure to opt out constitutes consent to a non-debtor release in bankruptcy, "then no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief afforded the absent releasing parties." *Id.* at 687. Indeed, unlike members of a certified class action who get to share in the class recovery, those deemed to grant the third-party release are receiving no compensation from the released non-debtors. And Debtors' public shareholders

are receiving less than nothing; their equity is being wiped out, with equity in the reorganized debtors being given instead to lenders benefiting from the release.

## II.    The Bankruptcy Court Erred by Imposing the Injunction Barring Claims Between Non-Debtors.

The bankruptcy court also erred by entering an injunction barring claims between non-debtors.  The bankruptcy court conducted no legal analysis to determine whether it had jurisdiction to enter injunctive relief, whether such relief was statutorily authorized, or whether such relief was warranted.  Nor did it make any factual findings to support its imposition of an injunction.  Instead, the court simply asserted that because an injunction was an enforcement mechanism and "more a process than it is substance," "I don't believe the use of the injunction to support a consensual release is in any way prohibited by the case law, either by *Purdue* or in the Fifth Circuit."  3ER538 (Tr. at 43).  This was error.

An injunction is critically different from a consensual non-debtor release.  The legal effect of a consensual release is based on the parties' agreement.  The non-debtor parties themselves are altering their relations; the court is not using its judicial power to effect that change.  An injunction, by contrast, relies on the court's power to enter orders binding on parties.  The court must therefore have both constitutional and statutory authority to enter an injunction.  And, once such jurisdiction and authority are established, the court still must determine that an injunction is

warranted.  But jurisdiction, authority, and a showing that injunctive relief is warranted are all absent here.

First, the bankruptcy court lacked jurisdiction to enter a permanent injunction barring claims between non-debtors.  *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 755, 757 (1995).  While 28 U.S.C. § 1334(b) provides concurrent jurisdiction over civil proceedings "related to" a bankruptcy case, the enjoined claims between these thousands of non-debtors do not "relate to" Debtors' chapter 11 case.

"An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and in any way impacts upon the handling and administration of the bankrupt estate." *Zale*, 62 F.3d at 752.  "For jurisdiction to attach, the anticipated outcome of the action must both (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate." *Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1022 (5th Cir. 1999).  Post-confirmation jurisdiction is more limited. "After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas, Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001).  "No longer is expansive bankruptcy court jurisdiction required to facilitate 'administration' of the debtor's estate, for there is no estate left to reorganize." *Id.* (cleaned up).

43

Here, the claims between non-debtors are not property of Debtors or the estate, will not impact the estate, and do not bear on the execution of Debtors' plan. "[T]he state law causes of action" barred by the injunction "do not bear on the interpretation or execution of the debtor's plan." *Craig's Stores*, 266 F.3d at 391. Nor would the post-confirmation pursuit of such claims against non-debtors have any impact on Debtors' bankruptcy estate, which ceased to exist at confirmation. Accordingly, the bankruptcy court had no jurisdiction to enjoin those claims. *Craig's Stores*, 266 F.3d at 391; *Zale*, 62 F.3d at 756-57.

The bankruptcy court also lacked jurisdiction to enter injunctive relief because Debtors lacked standing to seek it. A party seeking injunctive relief must have standing to do so. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *Wells Fargo Bank, N.A. v. Stewart (In re Stewart)*, 647 F.3d 553, 557 (5th Cir. 2011). To have standing, the party seeking injunctive relief must show "that he has sustained or is immediately in danger of sustaining some direct injury" and "the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 105; *see also Stewart*, 647 F.3d at 557. "Absent such a showing, there is no case or controversy regarding prospective relief, and thus no basis in Article III for the court's power to issue an injunction."[14] *Stewart*, 647 F.3d at 557; *accord Lyons*, 461 U.S.

---

[14] Although the bankruptcy court is not an Article III court, "[a] party that lacks standing to support jurisdiction in an Article III court also lacks standing for that claim to be adjudicated by a bankruptcy court." *Stewart*, 647 F.3d at 557.

at 101-02.  Debtors made no such showing here.  Accordingly, the bankruptcy court lacked jurisdiction to enter injunctive relief barring the released claims.

Second, there is no authority in the Bankruptcy Code for the injunction barring claims between non-debtors.  Debtors cannot rely on section 105(a) for this authority because it "serves only to carry out authorities expressly conferred elsewhere in the code."  *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted).  But nothing in the Code authorizes the court to use its judicial power to bar claims between non-debtors. *Id.* at 227.

Finally, such an injunction is not warranted by the traditional factors that support injunctive relief.  A party seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *id.* (noting that an injunction is an "extraordinary remedy").

Debtors never argued, and the bankruptcy court never found, that these factors were met.  2ER361-362, 368-370 (Dkt.167 at 66-67, 90-92); 3ER388-389, 538

45

(Dkt.181 at 15-16, Tr. at 43). *Cf. Zale*, 62 F.3d at 765 (reversing where there was "no indication in the record that the bankruptcy court conducted the proper analysis and made the requisite findings for entry of a preliminary injunction"). They are not. There was no showing of an imminent threat that anyone was going to bring suit on a released claim. But an injunction "is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat." *Lyons*, 461 U.S. at 111 (cleaned up). And the injunction harms those bound by it because it precludes them from challenging the applicability or enforceability of the third-party release (e.g., based on mistake or lack of capacity) under applicable non-bankruptcy law.

Debtors suggested below that the injunction provisions are permissible because there was consent. *See* 2ER369 (Dkt.167 at 91). But there was no consent to the injunction. Even if a failure to opt out could be treated as consent, claimants were not allowed to opt out of the plan's injunction provisions. *See* 2ER265, 266, 268, 270, 271, 290, 291, 292, 294, 303, 304, 305, 307 (Dkt.81 at 27, 28, 30, 32, 33, 52, 53, 54, 56, 65, 66, 67, 69) (all referring only to possibility of opting out of "the Third-Party Release"). Further, Debtors have not explained how such consent could remedy the lack of jurisdiction and statutory authority or the failure to satisfy the requisites for injunctive relief.

## III.    The Bankruptcy Court Erred by Imposing the Gatekeeping Injunction.

The plan also includes a gatekeeping provision that forces *any* "Person or Entity" who wishes to pursue a claim against a released non-debtor to come to the bankruptcy court—and only the bankruptcy court—for a determination of whether that claim is "colorable" and for bankruptcy court permission to bring it.  3ER427, 508-509 (Dkt.181 at 54, 135-136).  By specifying that the bankruptcy court shall determine whether a claim can proceed, the plan's gatekeeping provision effectively grants the bankruptcy court exclusive jurisdiction to adjudicate whether non-debtors can pursue a claim against other non-debtors.

The Confirmation Order's gatekeeping injunction is erroneous for the same reasons as its injunction barring claims—the bankruptcy court lacked both jurisdiction and statutory authority to enter such an injunction and there was no showing that injunctive relief is warranted, *see supra* Part II—but exponentially more problematic because it applies to *any* "Person or Entity."

In addition, because there is no "related to" jurisdiction over these non-debtor claims, not only does the bankruptcy court lack jurisdiction to enter the injunction, it also lacks jurisdiction to perform the gatekeeping function it has exclusively assigned to itself.  And even if there were "related to" jurisdiction, reserving exclusive jurisdiction in the bankruptcy court to determine whether those non-debtor claims can proceed is contrary to Congress's grant of concurrent jurisdiction over such claims.  11 U.S.C. § 1334(b) (providing "original but no exclusive jurisdiction").

47

Further, the gatekeeping injunction contravenes the basic premise that once a company confirms a reorganization plan it "is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens." *Craig's Stores*, 266 F.3d at 390 (cleaned up). This is even more true for the thousands of non-debtors protected by the gatekeeping injunction. Gatekeeping would create inefficient piecemeal litigation contrary to the purpose of "related to" jurisdiction. *See Zale*, 62 F.3d at 752 ("[W]hen we define 'related to' jurisdiction, we should avoid the inefficiencies of piecemeal adjudication and promote judicial economy by aiding in the efficient and expeditious resolution of all matters connected to the debtor's estate.") (cleaned up). Parties would have to go to the bankruptcy court for permission to sue, then to the court where they want to sue to file the complaint, and then back to the bankruptcy court again if they want to amend the complaint, then back to the court presiding over the suit if the bankruptcy court allows the amendment. That makes no sense. It increases the burden on the courts, imposes unnecessary costs and delay on the parties, and unnecessarily interferes with other courts' jurisdiction and ability to manage the cases before them. *See Zale*, 62 F.3d at 755 ("[C]ourts must be particularly careful in ascertaining the source of their power, lest bankruptcy courts displace state courts for large categories of disputes.") (cleaned up). There is no reason to deviate from the ordinary course in which the court presiding over a lawsuit determines whether the claims are

48

"colorable," adjudicates any defenses, including the defense of release, and determines whether any amendments to the complaint should be permitted.

The only authority the court and Debtors cited to support the gatekeeping injunction was *Highland Capital*. 2ER369 (Dkt.167 at 91); 3ER538 (Tr. at 43). But that case addressed exculpation provisions that were permissible under Fifth Circuit law because they were limited to the conduct of estate fiduciaries during the bankruptcy case. *Highland Cap.*, 48 F.4th at 437. The only gatekeeping it permitted was for actions "against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity." *Id.* at 439. The gatekeeping provision here bears no such connection to the conduct of these estate fiduciaries in their official capacity during the case. Rather, it extends to prepetition claims belonging to *anyone* based on conduct "reasonably likely to relate to any act or omission in connection with, relating to, or arising out of" a released claim, such as claims relating to the operation of Debtors or their non-debtor affiliates. 3ER424-425, 427, 506-607 (Dkt.181 at 51-52, 54, 133-35). The gatekeeping provision here is nothing like what the Fifth Circuit approved in *Highland Capital*.

## CONCLUSION

For these reasons, the United States Trustee respectfully asks this Court to reverse the bankruptcy court's confirmation order and strike from it the third-party release and related injunction provisions.

49

Respectfully submitted,

KEVIN M. EPSTEIN
United States Trustee for Region 7

February 18, 2025

By: _Ha M. Nguyen_
HA M. NGUYEN
Trial Attorney

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
Trial Attorney

Department of Justice
Executive Office for United States
    Trustees
441 G Street, N.W., Suite 6150
Washington, DC  20530
(202) 307-1399
E-mail: Beth.A.Levene@usdoj.gov

MILLIE APONTE SALL
Assistant United States Trustee
Tex. Bar No. 01278050/Fed. ID No. 11271
HA M. NGUYEN
Trial Attorney
CA Bar No. 305411/Fed ID No. 3623593
VIANEY GARZA
Trial Attorney
Tex. Bar No. 24083057/Fed. ID No. 1812278

Department of Justice
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, Texas 77002
(713) 718-4650 – Telephone
E-mail: Millie.Sall@usdoj.gov
E-mail: Ha.Nguyen@usdoj.gov
E-mail: Vianey.Garza@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Bankruptcy Procedure 8015(g), this document contains 12,567 words.

This document complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*Beth A. Levene*
BETH A. LEVENE
Trial Attorney

## CERTIFICATE OF SERVICE

I certify that on February 18, 2025, I caused this brief and the three volumes of Excerpts of Record of Appellant Kevin M. Epstein, United States Trustee to be served via the CM/ECF Electronic Filing system on all parties.

By: *Ha M. Nguyen*
HA M. NGUYEN
Trial Attorney