United States District Court
Southern District of Texas

**ENTERED**

February 12, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THE CONTAINER STORE GROUP, INC., *et al.*, | § | BANKRUPTCY CASE NO. 24-90627 |
| | § | |
| Debtors. | § | |
| | § | |
| KEVIN M. EPSTEIN, UNITED STATES TRUSTEE FOR REGION 7, | § | CIVIL ACTION NO. H-25-618 |
| | § | |
| Appellant, | § | |
| v. | § | |
| | § | |
| THE CONTAINER STORE GROUP INC., *et al.*, | § | |
| | § | |
| Appellees. | § | |

**MEMORANDUM AND OPINION**

This bankruptcy appeal involves Chapter 11 relief sought by the Container Store and affiliated companies. The U.S. Trustee appealed the Bankruptcy Court's confirmation order, challenging three parts of the reorganization plan: the third-party releases; the permanent injunction enforcing those releases; and the gatekeeping provision. (Docket Entry No. 2). The Debtors have moved to dismiss on the grounds that the Trustee lacks standing and that the appeal is equitably moot. (Docket Entry No. 12). The Debtors also argue that the appeal fails on the merits. (Docket Entry No. 13).

Based on the motions, the briefs, the record, and the applicable law, the court largely affirms the judgment of the Bankruptcy Court. The court affirms the third-party release provision and permanent injunction except as applied to Class 5 and Class 8 claimants. The court narrows rather than strikes the gatekeeping provision and remands to the Bankruptcy Court to determine

the proper scope of that provision. The court denies the Debtors' motion to dismiss the appeal based on standing and equitable mootness, (Docket Entry No. 12), and denies the Trustee's motion to stay, (Docket Entry No. 17).

## I.    Background

The Container Store's Chapter 11 bankruptcy was a complex response to the significant financial difficulties the Container Store faced in the aftermath of COVID. (Bankr. Docket Entry No. 6 ¶ 39). On December 21, 2024, the Container Store succeeded in reaching a Transaction Support Agreement with lenders on a restructuring and reorganization plan that provided much-needed new capital. (*Id.* ¶¶ 8, 52). The next day, the Container Store and its affiliates filed for Chapter 11 bankruptcy, submitting a prepackaged Plan. (Bankr. Docket Entry Nos. 1, 19).[1]

The Plan called for multiple creditor classes, only one of which was entitled to vote on the proposed terms. (Bankr. Docket Entry No. 181 at 100). Those not voting included three creditor classes—other secured claims, prepetition asset-based lending claims, and general unsecured claims—that would receive a full recovery and were deemed to accept the Plan under § 1126(f), (Classes 1, 2, and 4); two classes of creditors—the subordinated claims and the existing equity interests—that would not receive any recovery and were deemed to reject the Plan under § 1126(g), (Classes 5 and 8); and two classes of creditors whose claims were held by the Debtors and their affiliates that were deemed to either accept or reject the plan under §§ 1126(f) and (g), (Classes 6 and 7). (*Id.* at 100–03). The only class of creditors that could vote was Class 3, an "impaired" class consisting of all prepetition term loan creditors.[2] (*Id.* at 101).

---

[1] The Plan was later amended. (Bankr. Docket Entry No. 165).

[2] The Plan defined "impaired" to mean "with respect to any Claim or Interest, a Claim or Interest that is 'impaired' within the meaning of section 1124 of the Bankruptcy Code." (Bankr. Docket Entry No. 181 at 86). The Code generally considers claims against the debtor to be impaired if the reorganization plan alters

Article IX.C of the Plan included a third-party release.[3]  (*Id.* at 133–34).  The Plan defined "Releasing Parties" to include creditors who do not "opt out of" the releases in the Plan or do not timely object to the third-party releases.  (*Id.* at 91).  The Plan defined "Released Party" to include, among other things, both Debtors and nondebtor releasing parties.  (*Id.*).  The definitions of "Releasing Parties" and "Released Party" both included "Related Parties," such as the Store's current and former members, directors, managers, and officers.  (*Id.* at 90–91).  The third-party release provided that "each Releasing Party" has "released, and absolved each Released Party from any and all Claims and Causes of Action, whether known or unknown," that are "based on or relating to, or in any manner arising from, in whole or in part," 10 categories of claims.[4]  (*Id.* at 133–34).  The third-party release excluded claims of fraud, gross negligence, or willful misconduct that arise out of, or are related to, any act or omission of a Released Party.  (*Id.* at 134).  It also excluded claims against a Released Party "arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtors or the Reorganized Debtors."  (*Id.*).

To implement the third-party release, the Debtors proposed that the Bankruptcy Court enter a permanent injunction enjoining parties from asserting released claims.  The injunction was contained in Article IX.E of the Plan.  (*Id.* at 135).  In addition to the permanent injunction, Article

---

the value of the claim.  *See* 11 U.S.C. § 1124(1).  In cases with third-party releases, creditors may still be impaired-in-fact even if their claims against the debtor are unimpaired; the third-party releases may alter the value of the creditors' claims against the third parties.  *See Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204, 227 (2024) (discussing releases that provide "for the full satisfaction of claims against a third-party nondebtor").

[3] The Debtors' release was contained in Article IX.B.  (Bankr. Docket Entry No. 181 at 132–33).

[4] Among other things, those categories included the management, ownership, or operation of the Debtors or the nondebtor affiliates; the purchase, sale, or rescission of "any Security" of the Debtor or the nondebtor affiliates; and the "business or contractual arrangements between" any Debtor or nondebtor affiliate and any other entity.  (Bankr. Docket Entry No. 181 at 133–34).

IX.E also provided that "No Person or Entity" may sue "the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties" for a claim or cause of action "that relates to or is reasonably likely to relate to any act or omission with, related to, or arising out of" a released claim, without the Bankruptcy Court first determining that the claim was "colorable" and "specifically authorizing" the claim to be brought. (*Id.* at 135–36). The parties refer to this as the "gatekeeping provision."[5] (Docket Entry No. 2 at 20; Docket Entry No. 13 at 24).

After a hearing, the Bankruptcy Court entered an order approving notice and solicitation procedures. (Bankr. Docket Entry No. 81). The Debtors sent the creditors a "Combined Notice," which included the date of the confirmation hearing, objection procedures, and instructions to access the disclosure statement detailing the Plan. (*Id.* at 11–17). The release, injunction, and exculpation provisions were included as "Appendix A" to the Combined Notice. (*Id.* at 18–23). The Debtors also sent Class 3 voters a solicitation package that included the disclosure statement, the proposed plan, and a ballot. The ballot explained that "Holders [who] do not opt out of the Third-Party Release will be deemed to have granted such releases." (*Id.* at 27). The ballot provided a separate section on the third-party release with a checkbox to allow the voter to opt out of the release and explained that "in the event you opt out of the Third-Party Release, you will <u>not</u> be granted a release from the Releasing Parties under the Plan." (*Id.* at 29–34).

The Debtors also distributed notice and opt-out materials to creditors who were not entitled to vote. (*Id.* at 41–63). As in the Combined Notice and materials distributed to Class 3 voters, the release, injunction, and exculpation provisions in the Plan were included as an appendix. (*Id.* at 45–50). The opt-out form contained in the non-voting materials stated in bold font that if the non-

---

[5] A gatekeeping provision is also a type of injunction; it is a *pre-filing* injunction. *See In re Highland Cap. Mgmt., L.P. (Highland II)*, 132 F.4th 353, 356 n.2 (5th Cir. 2025).

voter failed to opt out by following the instructions in the notice, they would "automatically" be deemed to consent to the third-party release. (*Id.* at 52). Even though holders of claims and interests in Classes 5 and 8 received no distribution and could not vote, they received an opt-out form "solely for the purposes of affirmatively opting out of the Third-Party Release." (Bankr. Docket Entry No. 181 at 104).

The Trustee objected on the ground that the opt-out procedure for the third-party releases made the releases nonconsensual and therefore barred by the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). (Bankr. Docket Entry No. 150). The U.S. Securities and Exchange Commission (SEC) objected on the same basis, but only as to Classes 5 and 8. (Docket Entry No. 152). Both the Trustee and the SEC argued that state contract law applied to determine what constitutes "consent" to opt-out. (Bankr. Docket Entry No. 150 at 7; Bankr. Docket Entry No. 152 at 6). The Trustee also argued that the injunction and gatekeeping provisions were not authorized by the Bankruptcy Code and violated Fifth Circuit precedent. (*Id.* at 31–33).

On January 24, 2025, the Bankruptcy Court held a confirmation hearing and confirmed the Plan. (Bankr. Docket Entry Nos. 181, 201). The Bankruptcy Court overruled the objections to the third-party releases, concluding that they were a "necessary and integral" part of the Plan and were "fair, equitable and reasonable." (Bankr. Docket Entry No. 181 at 14). The Bankruptcy Court concluded that the releases were "designed to provide finality for the Released Parties with respect to such parties' respective obligations under the Plan," were "consistent with established practice in this jurisdiction and others," and that the Debtors' key stakeholders were "unwilling to support the Plan without the Third-Party Release." (*Id.* at 14–15). The Bankruptcy Court also concluded that the creditors were given adequate notice of the opt-out process and pointed out that

the releases were "provided in exchange for significant consideration." (*Id.*). The Bankruptcy Court stated that the third-party release and injunction provisions were "important to the overall objectives of the Plan" by finally resolving certain claims and were "consistent with Sections 105, 1123, and 1129" of the Code. (*Id.* at 16).

The Bankruptcy Court also overruled the objections based on *Purdue*, noting that it was "not writing on a blank slate." (Bankr. Docket Entry No. 201 at 41). The Bankruptcy Court explained that for a long time, the Fifth Circuit had not allowed nonconsensual third-party releases—the issue at the heart of *Purdue*—but *had* allowed third-party releases that were deemed consensual "by the use of an opt-out mechanism that allows for notice to the parties, actual notice to the parties, and then allows them the opportunity to opt out." (*Id.*). The Bankruptcy Court added that "the Supreme Court was clear in *Purdue* . . . when they said nothing that we have said should be construed to call into question consensual third-party releases offered in connection with bankruptcy [re]organizations." (*Id.* at 42). The Bankruptcy Court concluded that "the evidence [was] uncontroverted" that "service was effective" and that "giving the opportunity . . . to opt out is consistent with having consensual third-party releases." (*Id.*).

On January 28, 2025, the Plan became effective and was quickly substantially consummated. (Bankr. Docket Entry No. 200; Bankr. Docket Entry No. 280 at 3). On February 3, 2025, the Trustee appealed and filed an emergency motion to stay the confirmation order pending appeal. (Bankr. Docket Entry Nos. 209, 210). The Bankruptcy Court denied emergency treatment of the motion and later denied the stay, finding that, among other things, the Trustee had failed to show a likelihood of success on the merits. (Bankr. Docket Entry Nos. 213, 280).

## II.    The Legal Standard

A federal district court has jurisdiction to hear appeals from a bankruptcy court's final orders.  28 U.S.C. § 158(a).  "A confirmation order is an appealable final order" within this court's jurisdiction.  *In re Highland Cap. Mgmt., L.P. (Highland I)*, 48 F.4th 419, 429 (5th Cir. 2022).  "The district court reviews the bankruptcy court's findings of fact for clear error and conclusions of law *de novo*."  *In re CJ Holding Co.*, 597 B.R. 597, 604 (S.D. Tex. 2019).

## III.    The Motion to Dismiss

### A.    The United States Trustee's Standing

The Debtors first argue that this appeal must be dismissed because the Trustee lacks standing.  (Docket Entry No. 12 at 14).  Under 11 U.S.C. § 307, the Trustee "may raise and may appear and be heard on any issue in any case or proceeding under [Chapter 11]" except for filing a plan under § 1121(c).  The Trustee undoubtedly has statutory authority to appear in bankruptcy court proceedings.  The text of § 307—"in any case or proceeding"—indicates that Congress also intended to confer appellate standing on the Trustee.  Unlike in a bankruptcy court, however, the Trustee must also have constitutional standing to appear in this court.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997))).

Congress established the position of Trustee to "protect[] the public interest and ensur[e] that bankruptcy cases are conducted according to law."  *In re Revco D.S., Inc.*, 898 F.2d 498, 500 (6th Cir. 1990) (quoting H.R. Rep. No. 595, 95th Cong. 109, 2d Sess. 404, *reprinted in* 1978 U.S. Code Cong. & Admin. News 6070); *see also* Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549.  The Supreme Court has recognized that, at least in some circumstances, the

7

government has Article III standing based on purely public interests. *See, e.g.*, *SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 459–60 (1940); *see also In re Debs*, 158 U.S. 564, 584 (1895) (the government's obligation to "promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court"). In *U.S. Realty*, the Supreme Court permitted the SEC to intervene and appeal in a bankruptcy proceeding.  310 U.S. at 458–60.  The Court rejected the argument that the SEC must have "a direct personal or pecuniary interest in the subject of the litigation" to intervene. *Id.* at 459.  Rather, it was "plain that the [SEC] ha[d] a sufficient interest in the maintenance of its statutory authority and the performance of its public duties to entitle it through intervention to prevent reorganizations, which should rightly be subjected to its scrutiny from proceeding without it." *Id.* at 460.

The Debtors argue that the government's "public interest" does not confer Article III standing on the Trustee.  (Docket Entry No. 24 at 4–5).  Their position contradicts case law from the First, Second, Third, Fourth, Sixth, and Ninth Circuits holding that the Trustee has standing to appeal a bankruptcy order even without a pecuniary interest. *See In re Zarnel*, 619 F.3d 156, 162 (2d Cir. 2010) ("[T]he U.S. Trustee's responsibility to represent and protect the public interest affords it a substantial interest in, and therefore standing to proceed with, this appeal."); *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 225 (3d Cir. 2003) (the Trustee has standing under § 307 and as an "officer[] of the Department of Justice who protect[s] the public interest by aiding bankruptcy judges in monitoring certain aspects of bankruptcy proceedings"); *In re Donovan Corp.*, 215 F.3d 929, 930 (9th Cir. 2000); *In re Clark*, 927 F.2d 793, 795–96 (4th Cir. 1991); *In re Plaza de Diego Shopping Ctr., Inc.*, 911 F.2d 820, 824 (1st Cir. 1990); *In re Revco, D.S., Inc.*, 898 F.2d at 499–500 (the Trustee had standing based on his interest in "protecting the public interest and ensuring that bankruptcy cases are conducted according to law" (quoting reference omitted)).

In *In re Community Home Financial Services, Inc.*, the Fifth Circuit favorably relied on much of this precedent, including *In re Clark*, *In re Plaza de Diego Shopping Ctr., Inc.*, and *In re Revco*. *See* 990 F.3d 422, 426–27 (5th Cir. 2021). The Debtors argue that *In re Community Home Finance Services* is inapposite because it discussed "appellate standing of *bankruptcy trustees* representing the bankruptcy estate, not U.S. Trustees." (Docket Entry No. 24 at 7 n.2). Although the case did not involve the Trustee, the Fifth Circuit cited cases involving the Trustee and other bankruptcy trustees interchangeably. Particularly relevant is the statement, quoting *In re Clark*, that "[t]rustee standing does not arise from the trustee's pecuniary interest, but rather from the trustee's 'official duty to enforce the bankruptcy law in the public interest.'" *In re Cmty. Home Fin. Servs., Inc.*, 990 F.3d at 427 (quoting *In re Clark*, 927 F.2d at 796). *In Re Community Home Finance Services* strongly supports the conclusion that the Trustee has Article III standing to appeal.

The Debtors argue that the recent Fifth Circuit decision in *In re Highland Capital Management, L.P.*, 74 F.4th 361 (5th Cir. 2023), supports their position that the Trustee lacks standing. (Docket Entry No. 12 at 20). But that case did not involve the Trustee and instead considered a private party's standing under § 1109(b), which states that "[a] party in interest . . . may raise and may appear and be heard on any issue in a case under [Chapter 11]." 74 F.4th at 370 (quoting 11 U.S.C. § 1109(b)). The Fifth Circuit held that § 1109(b) did not confer appellate standing on parties who were not "person[s] aggrieved" by the outcome of the bankruptcy proceeding. *Id.* at 370–71. Because § 1109(b) uses the same language as § 307, the Debtors argue that the same reasoning requires this court to conclude the Trustee lacks appellate standing.

There are several issues with that argument.  First, three relevant statutory provisions use the phrase "may raise and may appear and be heard on any issue" in a Chapter 11 case.  *See* 11 U.S.C. §§ 307, 1109(a), 1109(b).  Only one of those provisions prohibits the relevant party—in that case, the SEC—from "appeal[ing] from any judgment, order, or decree entered in the case." *Id.* § 1109(a).  It cannot be accurate that the phrase "may raise and may appear and be heard on any issue" never confers appellate standing; otherwise, the portion of § 1109(a) that prohibits the SEC from appealing would be surplusage.[6]  Second, it is unclear how "persons aggrieved" is different from persons "directly and adversely affected pecuniarily" by a bankruptcy order.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 (3d Cir. 2004) (explaining the history of the "persons aggrieved" test).  As detailed above, multiple circuits, including the Fifth Circuit, have rejected the pecuniary-interest test as the foundation for Trustee standing.  *See, e.g.*, *In re Cmty. Home Fin. Servs., Inc.*, 990 F.3d at 427 (recognizing "the inadequacy of a pecuniary-interest test for trustee standing").  Rather, the Trustee's "official duty to enforce the bankruptcy law in the public interest" confers appellate standing.  *See id.* (quoting *In re Clark*, 927 F.2d at 796).

The Plan includes third-party releases obtained through an opt-out procedure, a permanent injunction enforcing the releases, and a "gatekeeping provision" that requires the Bankruptcy Court to screen certain future claims.  The Trustee argues that those provisions are unlawful.  *Cf. Purdue*, 603 U.S. at 227 ("[T]he bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against

---

[6] Another provision states that "[t]he Board, the Department of Transportation, and any State or local commission having regulatory jurisdiction over the debtor may raise and may appear and be heard on any issue in a case under this chapter, but *may not appeal* from any judgment, order, or decree entered in the case."  11 U.S.C. § 1164 (emphasis added).  When Congress wanted to allow a government entity to participate in bankruptcy proceedings but prevent it from appealing, it knew how to say so.

a nondebtor without the consent of affected claimants.").[7]  Unlike the patent infringement analogy offered by the Debtors, (Docket Entry No. 24 at 4–5), the Trustee represents a significant and concrete public interest in this case by advocating for those who have not formally appeared in the proceedings.  That interest gives the Trustee standing, regardless of the merits of the appeal.

### B.  Equitable Mootness

The Debtors also ask the court to dismiss this appeal as equitably moot.  (Docket Entry No. 12 at 21).  "Unlike an Article III inquiry which examines whether a live controversy exists, an equitable mootness analysis recognizes that a point exists beyond which a court cannot order fundamental changes in reorganization actions."  *In re Idearc, Inc.*, 662 F.3d 315, 318 (5th Cir. 2011).  The Fifth Circuit is "more hesitant to invoke equitable mootness than many circuits, treating it as a 'scalpel rather than an axe.'"  *In re Sneed Shipbuilding, Inc.*, 916 F.3d 405, 409 (5th Cir. 2019) (quoting *In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009)).  "This court examines three factors when assessing equitable mootness: (i) whether a stay has been obtained, (ii) whether the plan has been 'substantially consummated,' and (iii) whether the relief requested would affect either the rights of parties not before the court or the success of the plan."  *In re Idearc, Inc.*, 662 F.3d at 318–19 (quoting *In re Scopac*, 624 F.3d 274, 281 (5th Cir. 2010)).  The Fifth Circuit applies equitable mootness "claim-by-claim, instead of appeal-by-appeal."  *Highland I*, 48 F.4th at 429.

---

[7]  In *Purdue*, the Trustee challenged a Chapter 11 bankruptcy on the basis that the plan involved nonconsensual third-party releases.  The parties argued standing in their briefs before the Supreme Court and at least two Justices asked about standing at the argument.  But the Court resolved the case on the merits.  Although not dispositive, the fact that neither the majority nor the dissent questioned the Trustee's standing supports the Trustee's argument that it has standing to bring this appeal.  *Cf. Trump v. Hawaii*, 585 U.S. 667, 697 (2018) ("Because we have an obligation to assure ourselves of jurisdiction under Article III, we begin by addressing the question whether plaintiffs have standing to bring their constitutional challenge.").

"Unlike Article III mootness, equitable mootness is prudential, not jurisdictional." *In re Blast Energy Servs., Inc.*, 593 F.3d 418, 424 (5th Cir. 2010). The Fifth Circuit is reluctant to apply equitable mootness and will often hold issues justiciable "notwithstanding the tug of equitable mootness." *In re Pac. Lumber Co.*, 584 F.3d at 243. The Fifth Circuit places heavy emphasis on a court's ability to excise aspects of a plan. "Only when the relief that a party requests will likely unravel the plan does it become impracticable and inappropriate for a court to grant such relief; in such a case, the court abstains from reviewing the appeal." *In re Blast Energy Servs.*, 593 F.3d at 424. "To that end, a court may 'fashion whatever relief is practicable' instead of declining to review simply because full relief is not available.'" *Id.* (quoting *In re Pac. Lumber Co.*, 584 F.3d at 241). "In exercising its discretionary power to dismiss an appeal on mootness grounds, a court cannot avoid its obligation to scrutinize each individual claim, testing the feasibility of granting relief against its potential impact on the reorganization scheme as a whole." *In re Pac. Lumber Co.*, 584 F.3d at 241 (quoting *In re AOV Indus. Inc.*, 792 F.2d 1140, 1448 (D.C. Cir. 1986)).

The Debtors argue that all three equitable mootness factors are met, although they do not distinguish among the parts of the Plan on appeal and seemingly consider the third-party release, injunction, and gatekeeping provision together. (*See generally* Docket Entry No. 12). The Debtors first assert that the Trustee did not obtain a stay and did not even try to obtain a stay until after all the transactions in the Plan had been consummated. (*Id.* at 22–23). Next, they emphasize that the Plan has been "substantially consummated." (*Id.* at 23). Finally, they argue that granting the Trustee's requested relief would affect parties not before the court and undermine the success of the Plan because it would open numerous parties to the unexpected risk of liability, impose new financial liability on the Container Store, and disturb Plan finality. (*Id.* at 25–26). The Debtors also point out that the Bankruptcy Court found that the third-party releases were "a necessary and

integral aspect of the Plan." (*Id.* at 26 (quoting Bankr. Docket Entry No. 181 at 14)).   In response, the Trustee notes that when the Bankruptcy Court denied the stay, it agreed that equitable mootness should not apply because that doctrine is "narrowly interpreted."   (Docket Entry No. 19 at 21 (quoting Bankr. Docket Entry No. 280 at 17)).   The Trustee further argues that the court can excise the challenged provisions without undermining the success of the Plan.   (*Id.* at 21).

The court declines to apply equitable mootness to any of the three provisions at issue. Notably, in *Highland I*, the Fifth Circuit reviewed whether equitable mootness applied to challenges to the permissibility of the exculpation, injunction, and gatekeeper provisions (the "protection provisions") in a reorganization plan.   The Fifth Circuit first commented that while there was no stay and the plan had been substantially consummated, those considerations alone did not "trigger equitable mootness." 48 F.4th at 430.   The Fifth Circuit then found that equitable mootness did not apply because "equity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process."   *Id.* at 431 (quoting *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008)).   The court asserted that "the goal of finality sought in equitable mootness does not outweigh a court's duty to protect the integrity of the process."   *Id.* (quoting *In re Pac. Lumber Co.*, 584 F.3d at 252).   It concluded that "[a]s in *Pacific Lumber*, the legality of a reorganization plan's non-consensual non-debtor release is consequential to the Chapter 11 process and so should not escape appellate review in the name of equity."   *Id.* at 431–32.   Equitable mootness "d[id] not bar" the court's review of the protection provisions.   *Id.* at 432.

In this case, similarly, there was no stay, the Plan has been substantially consummated, and the Bankruptcy Court found that the third-party release (enforced by the injunction and gatekeeping provision) was "necessary" to provide "finality."   (Bankr. Docket Entry No. 181 at 14).   The Bankruptcy Court noted that the Debtors' key stakeholders were unwilling to support the

Plan without the release. (*Id.* at 15). Although the Debtors lean heavily on the Bankruptcy Court's findings as to finality in their discussion of the third factor, (Docket Entry No. 12 at 25–26), *Highland I* and *In re Pacific Lumber Co.* are explicit that the goal of finality is insufficient to outweigh issues related to procedural integrity, and that the permissibility of releases is precisely the kind of issue that "should not escape appellate review in the name of equity." *Highland I*, 48 F.4th at 431–32; *see also In re Pac. Lumber Co.*, 584 F.3d at 251–52.

The Debtors also suggest that there might be some financial liability on the Container Store if the releases were struck because the Store has indemnified some of the third parties subject to the release. (Docket Entry No. 12 at 26). Those vague assertions are insufficient to justify the application of equitable mootness here. The Fifth Circuit routinely allows appeals to proceed to the merits when the ramifications of reversal are significantly clearer, and greater, than those the Debtors present. *See In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 328 (5th Cir. 2013) (noting that the Fifth Circuit has "permitted appeals to go forward even where granting full relief 'could have imposed a very significant liability on the estate, to the great detriment of both the success of the reorganization and third parties'" (quoting *In re Scopac*, 624 F.3d at 282)).

In summary, there is little justification for applying equitable mootness to this appeal, which: (1) challenges only certain excisable provisions, rather than the entire Plan; and (2) raises important questions of due process and fairness in the bankruptcy context. *Cf. In re Ultra Petrol. Corp.*, No. 21-20049, 2022 WL 989389, at *5 (5th Cir. 2022) (affirming the district court's application of equitable mootness where the plaintiff was requesting "reversal of the entire confirmation order" and not just the opt-out process and releases). That the Plan might not have moved forward without these provisions does not insulate them from review.

## IV.    The Merits

### A.    The Third-Party Releases

The Trustee's appeal primarily challenges the Plan's third-party release provision.[8] Consent to the third-party release was secured on an opt-out basis.  The issue is whether the notification and opportunity to opt out of the third-party releases made the releases consensual, and therefore binding, on the Releasing Parties.

The Debtors argue that this court has long held that consent to a release may be obtained by providing affected parties with clear notice of the release and an opportunity to opt out.  (Docket Entry No. 13).  The Bankruptcy Court found that the affected parties received adequate notice and opportunity to opt out.  (Bankr. Docket Entry No. 201 at 41–43).  The Trustee challenges the sufficiency of the notice procedures in passing but primarily takes the broad position that opting out can *never* provide consent under state law, making the releases ineffective under *Purdue*.  In short, as it has done in several other cases both in this district and around the country, "[t]he Trustee wants to use the *Purdue* holding as an opportunity to advance its long-held position that consensual third-party releases in a plan should require an opt-in feature, rather than an opt-out."  *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 322 (Bankr. S.D. Tex. 2024).

*Purdue* confirmed what the Fifth Circuit had long held: that a bankruptcy court may not confirm a plan that provided nonconsensual nondebtor releases.  603 U.S. at 227 (holding "only that the bankruptcy code does not authorize a release and injunction that, as part of a plan reorganization, effectively seeks to discharge claims against a nondebtor without the consent of

---

[8] The Trustee argues in its reply brief that the Debtors forfeited several arguments.  (*See, e.g.*, Docket Entry No. 18 at 15, 30).  Meanwhile, the Debtors argue that the Trustee also forfeited relevant arguments.  (Docket Entry No. 13 at 61–62).  As a matter of fairness, the court considers all arguments.  In addition, the court largely affirms, which it can do on any basis.  *In re Mahadevan*, No. 25-cv-901, 2025 WL 3296001, at *8 n.6 (S.D. Tex. Nov. 24, 2025).

affected claimants"). That was already the law in the Fifth Circuit. *See In re Pac. Lumber Co.*, 584 F.3d at 251–53. And the Court made clear that "[a]s important" as the questions it decided that day were the "ones [it] d[id] not." *Purdue*, 603 U.S. at 226. The Court emphasized that "[n]othing in what [it] ha[s] said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan." *Id.* The Court also clarified that it did not "have occasion . . . to express a view on what qualifies as a consensual release." *Id.* Although *Purdue*'s analysis of the Bankruptcy Code created questions explored further below, it did not call into question this court's long-established view that procedurally proper opt-out provisions can create consent to third-party releases.

The alleged twist in this case—and the argument that the Trustee has made in other courts since *Purdue*—is the assertion that opt-outs are nonconsensual under *state* law and are therefore barred by *Purdue*. The Trustee presents this as an *Erie* question, arguing that "the question of whether there is consent to a third-party release is governed by the same substantive contract law that would apply if there had been no bankruptcy." (Docket Entry No. 18 at 10). The Trustee is correct that, under *Erie*, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). But in this case, which arises under federal bankruptcy law, there may be federal statutes or "federal interest[s]" that "require[]" an application of federal law where state law might otherwise govern. *Butner v. United States*, 440 U.S. 48, 55 (1979). In such situations, "it is for the federal courts to fashion the governing rule of law according to their own standards." *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 367 (1943); *see, e.g.*, *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 457 (1957); *see also* Henry J. Friendly, *In Praise of Erie—And of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383, 422 (1964) ("The

16

complementary concepts—that federal courts must follow state decisions on matters of substantive law appropriately cognizable by the states whereas state courts must follow federal decisions on subjects within national legislative power where Congress has so directed—seem so beautifully simple, and so simply beautiful . . . .").

The Trustee raises two questions that the court must address at the outset: (1) does state or federal law determine whether the claimants consented to the third-party releases; and (2) what does consent require under the applicable law?

### 1. Federal Law Applies

The Trustee argues that "state law" applies (although it does not clearly identify in its opening brief which state's law applies)[9] because third-party releases are "separate agreements between non-debtors" and "[t]here is no Bankruptcy Code provision that preempts this otherwise applicable state contract law." (Docket Entry No. 2 at 31). The Debtors argue that "federal law" governs the issue, pointing in general terms to the Bankruptcy Code, this court's precedent, and analogous class action procedures. (Docket Entry No. 13). In a hearing, the Debtors clarified their position that the consensual releases were specifically authorized by 11 U.S.C. § 1123(b)(6), authorization that *Purdue* did not change. (Docket Entry No. 30 at 21). The Debtors also analogize an agreed reorganization plan to a consent decree. (Docket Entry No. 13 at 62–63).

The court concludes that there are two separate and independent bases of federal authority that require the application of federal law, rather than state contract law, to the question of whether claimants have "consented" to third-party releases contained in a bankruptcy reorganization plan. The first is the Bankruptcy Code via § 1123(b)(6) and § 105(a), which grant statutory authority to

---

[9] In its reply brief, the Trustee more clearly asserts that Texas law controls, on the ground that "no party has argued that any other jurisdiction's law applies." (Docket Entry No. 18 at 13).

bankruptcy courts over the provisions they may include in a reorganization plan. The second, and broader, basis for applying federal law is the inherent authority of federal courts to enter consent decrees in cases arising in equity within their subject-matter jurisdiction. Under either basis, federal law is the answer to the threshold question of what law provides the bankruptcy court with authority to enter consensual third-party releases. Unique federal interests compel the application of a federal, not state, rule of decision.

### i.        The Bankruptcy Code

Chapter 11 of the Bankruptcy Code "grants the bankruptcy courts residual authority to approve reorganization plans including 'any . . . appropriate provision not inconsistent with the applicable provisions of this title.'" *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (quoting 11 U.S.C. § 1123(b)(6)). The Code also provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of Chapter 11. 11 U.S.C. § 105(a). The Supreme Court has twice addressed claims that a reorganization plan exceeded the limits of a bankruptcy court's statutory authority under § 1123(b)(6): *Energy Resources* and *Purdue*.

In *Energy Resources*, the bankruptcy court included in the reorganization plan a provision that ordered the Internal Revenue Service to apply the debtor's tax payments to trust-fund tax liability before other kinds of tax liability. *Energy Res. Co.*, 495 U.S. at 547. If the debtor failed to pay the trust fund taxes, the government could "collect an equivalent sum directly from the officers or employees of the employer who are responsible for collecting the tax." *Id.* The IRS, the debtor, and the nondebtor officers all understood that the nondebtor officers would face "personal liability" if the employer was undercapitalized. *In re Energy Res. Co.*, 59 B.R. 702, 704 (Bankr. D. Mass. 1986). The nondebtor officers contributed funds to the bankruptcy plan to

"forestall" that outcome. *Id.* The upshot was that the bankruptcy court extinguished in part claims the IRS had against the nondebtors who insured the debtor's tax liabilities.

The IRS objected on the basis that the Code did not allow the bankruptcy court to limit its statutory "assurance that its taxes will be paid even if the reorganization fails" by directing the accounts it must credit. *Energy Res. Co.*, 495 U.S. at 550. The Supreme Court rejected the IRS's argument. The Court explained that the order was "necessary for a reorganization's success," which meant the IRS could "in all likelihood . . . collect the tax debt owed," and was "otherwise wholly consistent with a bankruptcy court's authority under the Bankruptcy Code." *Id.* at 549–51. Nothing "require[d]" the Court "to hold that the orders" were "improvident." *Id.* at 551. As a result, even though Code did not explicitly authorize bankruptcy courts to approve reorganization plans containing that kind of tax-allocation provision, the order was nonetheless "appropriate" under §§ 1123(b)(6) and 105(a). *Id.* at 549.

In *Purdue*, the bankruptcy court confirmed a reorganization plan that included "an order extinguishing vast numbers of existing and potential claims" against the Sacklers, nondebtor officers of the debtor corporation, "without securing the consent of those affected." 603 U.S. at 209. The Supreme Court held that the nonconsensual third-party releases were inappropriate. The Court explained that § 1123(b)(6) is a "catchall" confined by the other provisions of § 1123(b), "all of which concern *the debtor*—its rights and responsibilities, and its relationship with its creditors." *Id.* at 217–18. The Court noted that a nonconsensual release would be "inconsistent" with many "related provisions" in the Code. *Id.* at 221. Yet the Court did not "call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan," "express a view on what qualifies as a consensual release," or "pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor." *Id.* at 226. Nor did the Court

explicitly limit § 1123(b)(6) to only the creditor-debtor relationship.  At the same time the Court emphasized that § 1123(b)'s focus on the creditor-debtor relationship limited § 1123(b)(6)'s scope, it noted that "[d]oubtless, paragraph (6) operates to confer *additional* authorities on a bankruptcy court."  *Id.* at 218 (emphasis added) (citing *Energy Res. Co.*, 495 U.S. at 549).

The cases establish two principles.  First, under *Energy Resources*, "[a] bankruptcy court may confirm a plan that modifies a relationship between a creditor and a nondebtor third-party." *In re CJ Holding*, 597 B.R. at 607 (citing *Energy Res. Co.*, 495 U.S. at 549).  Second, under *Purdue*, a bankruptcy court may not confirm a plan that nonconsensually discharges a nondebtor. *Purdue*, 603 U.S. at 227.  The question is the scope of a bankruptcy court's authority between *Energy Resources* and *Purdue* to include other kinds of nondebtor releases under § 1123(b)(6). Under a maximalist reading of *Purdue*, § 1126(b)(6) is limited to the creditor-debtor relationship; under a fairer reading of *Purdue* and *Energy Resources*, *Purdue* merely prevents a bankruptcy court from relying on § 1126(b)(6) to enter nonconsensual third-party releases and says nothing about a bankruptcy court's authority under this provision to approve other kinds of releases, such as consensual or full-satisfaction releases.

*Energy Resources* is unclear as to precisely why the bankruptcy court was allowed to limit the IRS's recovery from the nondebtor officers even though the IRS did not expressly consent. One reading is that the IRS impliedly consented because the bankruptcy court found that the provision was necessary to a successful reorganization, under which "the IRS, in all likelihood, will collect the tax debt owed."  *Id.* at 549.  Adopting this approach, *Energy Resources* stands for the principle that § 1123(b)(6) provisions in a bankruptcy plan based on implied consent are appropriate when, for example, they "provide[] for the full satisfaction of claims against a third-party nondebtor."  *Purdue*, 603 U.S. at 226; *cf.* 11 U.S.C. § 1126(f).

20

Another reading of *Energy Resources* is that even if the bankruptcy court's order functionally limited the IRS's opportunity to recover against a nondebtor, the order formally altered only the "creditor-debtor relationship[]," *Energy Res. Co.*, 495 U.S. at 549, affecting only how the IRS accounted for the debtor's tax liabilities. This reading is seemingly inconsistent with Fifth Circuit case law preventing a bankruptcy court from adopting a provision that "effectively discharges a nondebtor." *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995); *see also In re Vitek, Inc.*, 51 F.3d 530, 536 n.27 (5th Cir. 1995) ("[N]on-debtor property . . . should not ordinarily be shielded by the powers of the bankruptcy court."). The Code recognizes contingent, unmatured, or future property rights, *see* 11 U.S.C. § 101(5)(A); the IRS held such a right against the nondebtor officers, *see Energy Res. Co.*, 495 U.S. at 547; and the bankruptcy court's order effectively discharged it, *see Purdue*, 603 U.S. at 265–66 (Kavanaugh, J., dissenting).

The better reading of *Energy Resources*—in line with the fairer reading of *Purdue*—is that nondebtor releases are appropriate under § 1126(b)(6) when, for example, the plan will "in all likelihood," 495 U.S. at 549, "provide[] for the full satisfaction of claims against [the] third-party nondebtor," *Purdue*, 603 U.S. at 226. Fifth Circuit precedent, which has long held that the Code does not permit nonconsensual nondebtor releases, follows this reading of *Energy Resources*. For example, the Fifth Circuit recognizes that "permanent injunctions of third-party claims against non-debtors have been allowed . . . when the injunction 'channel[s] those claims to allow recovery from separate assets and thereby avoid[s] discharging the nondebtor.'" *In re Highland Cap. Mgmt. (Highland II)*, 132 F.4th 353, 359 n.5 (5th Cir. 2025) (quoting *In re Zale Corp.*, 62 F.3d at 760); *see also In re Pac. Lumber Co.*, 584 F.3d at 252 (explaining that "non-debtor releases are most appropriate as a method to channel mass claims toward a specific pool of assets"). So long as a plan does not nonconsensually discharge—that is, immunize from liability—a nondebtor, it is

consistent with *Purdue*. *Cf. In re Pac. Lumber Co.*, 584 F.3d at 252 (contrasting these remedies

with "non-consensual non-debtor releases and permanent injunctions"); *Highland II*, 132 F.4th at

359 & n.5 (same).[10] *Energy Resources* and *Purdue* do not prohibit a bankruptcy court from relying

on § 1123(b)(6) to create *consensual* or *full-satisfaction* releases.[11]

The viability of consensual nondebtor releases under § 1123(b)(6) finds further support in

§ 1123(a)(4). This subsection requires the reorganization plan to "provide the same treatment for

each claim or interest of a particular class, unless the holder of a particular claim or interest agrees

to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Parties

who agree to a settlement under this provision are considered unimpaired. *See In re Hanish, LLC*,

570 B.R. 4, 20 (Bankr. D.N.H. 2017) ("[A]n agreement to less favorable treatment under 11 U.S.C.

§ 1123(a)(4) does not create an impairment, it removes one."). Through § 1123(a)(4), the Code

"contemplates the possibility of a creditor consenting to specific treatment that is less than the

creditor's full legal and equitable rights, with such agreed upon treatment not constituting

impairment." *In re Spirit Airlines, Inc.*, 668 B.R. 689, 702 (Bankr. S.D.N.Y. 2025). Just as a

claimant who receives "full satisfaction of claims against a third-party nondebtor," *Purdue*, 603

U.S. at 226; *e.g.*, *Energy Res. Co.*, 495 U.S. at 549, is unimpaired and deemed to accept a plan, *cf.*

---

[10] The channeling injunction is analogous to the common-law full-satisfaction rule for joint tortfeasors. A judgment creditor generally may not recover from more than one judgment debtor if the recovery from the first judgment debtor is "sufficient to put him in the position he would have occupied had there been no" injury giving rise to the judgment. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 512 (1964). The Fifth Circuit's channeling-injunction rule finds support in this concept because a fully-satisfied claimant would be barred from pursuing the nondebtor after recovering from the separate pool of assets, just as a judgment creditor would be barred from pursuing the second judgment debtor after recovering from the first. Anthony Casey & Joshua Macey, Purdue Pharma *and the New Bankruptcy Exceptionalism*, 2024 SUP. CT. REV. 365, 393 & n.129.

[11] *Highland I*, which analyzed these statutory provisions in the context of a nonconsensual release, does not alter this court's analysis. *Highland I*, 48 F.4th at 437.

11 U.S.C. § 1126(f);[12] so too may a party who is impaired by a nondebtor release agree to accept a plan, *cf. id.* § 1123(a)(4).

In sum, a bankruptcy court's power to grant consensual third-party releases is based in its authority to include in reorganization plans "appropriate" provisions that are not "inconsistent" with the Code, 11 U.S.C. § 1123(b)(6), and to issue any "order . . . that is necessary or appropriate to carry out" such provisions, *id.* § 105(a).  There is no Code inconsistency in modifying the relationship between claimants and nondebtors when claimants consent or their claims are fully satisfied.  *See In re CJ Holding Co.*, 597 B.R. at 607–08; *Energy Res. Co.*, 495 U.S. at 549–551; *In re Spirit Airlines*, 668 B.R. at 700–03; *cf. Purdue*, 603 U.S. at 226.

Because a bankruptcy court's authority to enter consensual releases follows from the Code's text and structure, it raises questions of federal law: what is "appropriate"; what is "necessary"; and what it means to "agree."  The inquiry begins with ordinary meaning and statutory definitions.  *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011).  "[I]n the absence of congressional definition[,] this is a matter to be determined by decisions of" the federal courts "after due consideration of the structure and purpose of the Bankruptcy Act as a whole, as well as the particular provisions of the Act brought in question."  *Katchen v. Landy*, 382 U.S. 323, 328 (1966); *see also In re Spirit Airlines*, 668 B.R. at 702.  "[W]hat constitutes consent, including opt-out features and deemed consent for not opting out, has long been settled in this [d]istrict."  *In re Robertshaw US Holding Corp.*, 662 B.R. at 323; *see also In re Pipeline Health Sys., LLC*, No. 22-

---

[12] A person who receives full compensation and is deemed to accept the plan under the Code is distinct from a person who receives both full compensation from the debtor and the released nondebtor.  *See Purdue*, 603 U.S. at 226 (clarifying that the Court did not address a plan that provides full satisfaction for a claimant's claim against a nondebtor).

90291, 2025 WL 686080, at *4 (Bankr. S.D. Tex. Mar. 3, 2025) (concluding that "[o]pt-out procedures are a proper means to obtain consent to third-party releases in a chapter 11 plan").

### ii.    Consent Decree

There is a separate basis for concluding that a bankruptcy court's authority to enter consensual third-party releases derives from federal law: a federal court's inherent power to enter consent decrees resolving claims within their jurisdiction. *See Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) ("The Judiciary Act of 1789 endowed federal courts with jurisdiction over "all suits . . . in equity." (quoting § 11, 1 Stat. 78)); *see, e.g.*, *Pac. R.R. v. Ketchum*, 101 U.S. (11 Otto) 289, 297 (1879). The Debtors make this analogy in their response brief. (Docket Entry No. 13 at 62–63). *Purdue* alluded to this power in rejecting the argument that the Sacklers sought anything like a "traditional release." *See* 603 U.S. at 223 (citing *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986)). And the Fifth Circuit has explained that a "bankruptcy plan . . . represents a kind of consent decree." *In re Tex. Com. Energy*, 607 F.3d 153, 158 (5th Cir. 2010) (citing *In re Stratford of Tex., Inc.*, 635 F.2d 365, 368 (5th Cir. 1981)).

Consent decrees "rest on different legal grounds than the nonconsensual release" at issue in *Purdue*. 603 U.S. at 226. A consent decree is a "'hybrid creature[]' that is 'part contract and part judicial decree.'" *ODonnell v. Harris County*, Civ. Action No. H-16-1414, 2019 WL 4224040, at *13 (S.D. Tex. Sep. 5, 2019) (quoting *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334 (5th Cir. 2018)). "[I]n addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree." *Firefighters*, 478 U.S. at 525. As a result, "[t]he entry of a consent decree is more than a matter of agreement among litigants. It is a 'judicial

24

act.'" *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993) (en banc) (quoting *United States v. Swift & Co.*, 286 U.S. 106, 115 (1932)).

Because of the unique combination of these two characteristics, "a consent decree can sweep more broadly than can other forms of court-ordered relief." *Smith*, 906 F.3d at 335. "[A] federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after trial." *Firefighters*, 478 U.S. at 525; *see In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 185 (2d Cir. 1987) ("[A] district court may provide broader relief in an action that is resolved before trial than the court could have awarded after trial." (alterations and quotation omitted)); *ODonnell v. Harris County*, ___ F. Supp. 3d ___, 2025 WL 3033987, at *11 (S.D. Tex. Oct. 30, 2025) (explaining that consent decrees may award "more than what a court would have ordered absent the settlement" (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 389 (1992))). The relief must, however, "spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." *Smith*, 906 F.3d at 335 (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004)); *see Clements*, 999 F.2d at 846 ("A consent decree must arise from the pleaded case and further the objectives of the law upon which the complaint is based.").

Under these principles, federal courts may enter judgments, including releases of claims between claimants and nondebtors, in conjunction with a reorganization plan that involves the claimants, debtors, and nondebtors. Consent decrees are within the subject-matter jurisdiction of the bankruptcy courts because they arise out of a petition filed under the Code and resolve claims that either "aris[e] under title 11, or aris[e] in or related to [a] case[] under title 11," 28 U.S.C. § 1334; *see Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5 (1995) (explaining that Congress

granted courts jurisdiction over "suits between third parties which have an effect on the bankruptcy estate").[13]  The releases are within the general scope of the petition for relief under Chapter 11 because they are related to the case and "necessary to the success of a reorganization plan." *Energy Res. Co.*, 495 U.S. at 549; (*Contra* Docket Entry No. 18 at 23 (arguing that the released claims are not pending before the Bankruptcy Court)).  And the releases further the Code's purpose of ensuring the success of a viable business and equity among creditor parties. *See, e.g.*, 11 U.S.C. §§ 1129(a)(7), (b)(1).  Here, the Bankruptcy Court made specific findings that the nondebtor releases were a "necessary and integral" part of the Plan and were "fair, equitable and reasonable." (Bankr. Docket Entry No. 181 at 14).

Although federal courts have the power to enter consent decrees enforcing relief broader than that allowed by federal law, the decree cannot extend beyond the terms of the consent that allowed the court to enter it.  "[P]arties who choose to resolve litigation through settlement may not dispose of the claims of a third party" and "may not impose duties or obligations on a third party, without that party's agreement." *Firefighters*, 478 U.S. at 529.  "A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting" parties. *Id.*  This limit raises the question of whether a state or federal rule controls if a party "consented" to a reorganization plan confirmed by a bankruptcy court under its authority

---

[13] Before the Bankruptcy Court, the Debtors argued that the nondebtor releases were narrowly tailored and related to this bankruptcy case.  (Bankr. Docket Entry No. 201 at 35–36).  The Bankruptcy Court found that it had jurisdiction to include the releases as part of the reorganization plan.  (*Id.* at 39).  The Trustee does not argue on appeal that certain claims affected by the third-party releases are outside the Bankruptcy Court's "related to" jurisdiction.  The Trustee's jurisdictional arguments in this appeal concern the Bankruptcy Court's jurisdiction to enjoin suits based on claims that no longer exists after a confirmation order releases them.  To the extent any claims within the releases are not "related to" the bankruptcy case or otherwise based on federal-question jurisdiction, state law would define consent to the third-party releases.  But for the reasons explained in this opinion, Texas law does not require affirmative consent to releases in all bankruptcy cases.

to enter consent decrees. *See Lincoln Mills*, 353 U.S. at 457 ("[S]tate law, if compatible with the purpose of [federal law], may be resorted to in order to find the rule that will best effectuate the federal policy.").

The federal rule of decision applies in this case. Whether federal or state rules govern the settlement of claim turns on the nature of the claim: federal claims are settled under federal law, and state claims are settled under state law. *In re Deepwater Horizon*, 786 F.3d 344, 354 & n.14 (5th Cir. 2015); *see Borne v. A & P Boat Rentals No. 4, Inc.*, 780 F.2d 1254, 1256 (5th Cir. 1986) (collecting cases).[14]  This rule is consistent with the one governing whether parties are bound by federal judgments. "The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507–08 (2001)). But the rule of decision adopted by federal common law depends on the nature of the judgment. When federal "substantive law is at issue," there is a "need for a uniform federal rule," *Semtek*, 531 U.S. at 508–09, that is "determine[d] and declare[d]" by the Supreme Court, *Taylor*, 553 U.S. at 891. When a federal court sits in diversity,

---

[14] The rule governing the interpretation of consent decrees is federal, but recent Fifth Circuit precedent is less clear. The Supreme Court has consistently applied federal rules of interpretation to consent decrees. *See, e.g.*, *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971); *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 235–37, 236 n.10 (1975). The Fifth Circuit traditionally did as well. *See, e.g.*, *Eaton v. Courtaulds of N. Am., Inc.*, 578 F.2d 87, 90 (5th Cir. 1978); *Strouse v. J. Kinson Cook, Inc.*, 634 F.2d 883, 885 (5th Cir. 1981); *Lelsz ex rel. Lelsz v. Kavanagh*, 824 F.2d 372, 373–74 (5th Cir. 1987). But recently, the Fifth Circuit has started to interpret consent decrees based on the law of the state in which the decree is entered. *See, e.g.*, *Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 318 (5th Cir. 2024); *cf. Allen v. Louisiana*, 14 F.4th 366, 371 & n.7 (5th Cir. 2021) (explaining that the court "consult[s] the contract law of the relevant state"). It is unclear when the Fifth Circuit makes state law controlling, as opposed to persuasive. But to the extent recent precedent has made state law controlling, such a rule does not appear tied to any precedent that conducted a choice-of-law analysis. A review of the cases frequently cited in recent Fifth Circuit precedent interpreting consent decrees refer to "general principles of contract interpretation," not state contract law, *see, e.g.*, *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998), or to cases about private contracts between private parties, *see, e.g.*, *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996), or to cases where the parties cited to state law to interpret the decree, *Frew v. Janek*, 780 F.3d 320, 327 n.28 (5th Cir. 2015). The sum of the precedent on how to interpret consent decrees further supports the conclusion that federal law controls the standard for consenting to them.

federal courts "adopt[], as the federally prescribed rule of decision, the law that would be applied by state courts in the State in which the federal diversity court sits." *Semtek*, 531 U.S. at 508. But even then, because the rule of decision is ultimately a federal question, "federal reference to state law will not obtain . . . in situations in which the state law is incompatible with federal interests." *Id.* at 509.

The consensual releases here are part of a reorganization plan issued by a bankruptcy court. *See* Anthony Casey & Joshua Macey, Purdue Pharma *and the New Bankruptcy Exceptionalism*, 2024 Sᴜᴘ. Cᴛ. Rᴇᴠ. 365, 394–95 (concluding that because the question of consent "is all tied up in the Chapter 11 plan confirmation process, the authority for such releases would lie in a provision of bankruptcy law, as opposed to state contract law"); *cf. Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683–85 (2015) (relying on a federal standard for implied consent to a bankruptcy-court judgment). This resolution is distinguishable from private settlements made between parties during a bankruptcy case that are not made part of the final judgment. *See, e.g.*, *In re Omni Video, Inc.*, 60 F.3d 230, 232 (5th Cir. 1995) (holding that state law governed a settlement between two parties in a bankruptcy adversary proceeding that was not incorporated into a final judgment); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380–82 (1994) (distinguishing between private settlement contracts and agreed judgments entered by federal courts); *Lynch, Inc. v. SamataMason Inc.*, 279 F.3d 487, 489 (7th Cir. 2002) ("A settlement agreement, unless it is embodied in a consent decree . . . , is enforced just like any other contract."). Instead, the Fifth Circuit has applied federal law's "general rules" of contract to a "bankruptcy plan" because it "represents a kind of consent decree." *In re Tex. Com. Energy*, 607 F.3d at 158. The federal common law directs the application of a federal, not state, rule of decision on the question of whether a claimant consented to a consent decree.

28

A state rule of decision defining consent for third-party releases in a reorganization plan would also materially undermine federal interests. There is a "strong federal interest," *In re Omni Video, Inc.*, 60 F.3d at 232, in applying a "uniform federal rule," *Semtek*, 531 U.S. at 508, to judgments that terminate cases arising under Congress's "uniform Laws on the subject of Bankruptcies," U.S. CONST. art. 1, § 8, cl. 4. A federal rule defining consent to a bankruptcy judgment can be appropriately tied to the "structure and purpose of the Bankruptcy Act as a whole." *Katchen*, 382 U.S. at 328. Applying federal law ensures the consistency of the administration of the bankruptcy laws throughout the United States. If state contract law applies, what would prevent a state from passing a bespoke law defining consent to a reorganization plan as including the most expansive opt-out imaginable, beholden to none of the principles established by precedent and practice?[15] Federal courts have been no strangers in recent years to unique state laws related to reorganization. *See, e.g.*, *In re LTL Mgmt., LLC*, 64 F.4th 84, 95–96, 110–11 (3d Cir. 2023) (dismissing, as filed in bad faith, a bankruptcy petition based on the Texas Two-Step, a corporate divisional merger authorized by Texas law).[16] There is a "strong federal interest" in determining whether claimants have consented to a reorganization plan that is based on the Code and on its equitable authority to approve a consent decree. *In re Omni Video, Inc.*, 60 F.3d at 232.

---

[15] Such a state-law rule may go beyond the previously recognized limits of due process in the context of federal preclusion law. *See Taylor*, 553 U.S. at 891–96. But if the state-law definition of consent truly controls whether a contract has formed between parties to a reorganization plan, then a federal court is bound to apply it absent some substantive constitutional reason not to do so. *See Erie*, 304 U.S. at 78. Yet federal courts have long been out of the constitutional business of interfering with the substance of state contract law. *E.g. Lochner v. New York*, 198 U.S. 45, (1905), *abrogated by W. Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937).

[16] *See also, e.g.*, Niko Gallogly, *New Texas Laws Open a Wild West for Corporate Governance*, N.Y. TIMES (Aug. 16, 2025), https://www.nytimes.com/2025/08/16/business/dealbook/texas-incorporation-delaware.html (discussing the current developments in the ongoing regulatory race to the bottom between states for corporate charters).

### 2.    Opt-Out Consent

A bankruptcy court's authority to enter consensual third-party releases is a matter of federal law.  And, as discussed, "what constitutes consent, including opt-out features and deemed consent for not opting out, has long been settled in this [d]istrict." *In re Robertshaw US Holding Corp.*, 662 B.R. at 323.  But as courts have recognized over the past several years, bankruptcy courts may not infer consent to a reorganization plan merely because notice and an opportunity to opt out has been provided.  Although "[h]undreds of Chapter 11 cases have been confirmed in this [d]istrict" with third-party releases made consensual through opt-outs, *id.*, bankruptcy courts do not simply rubber-stamp such releases.  Courts have refined the principles that guide a bankruptcy court's factual determination of whether claimants have consented to third-party releases.

The key precedent for finding that a claimant consented to be bound a judgment by failing to opt out is *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).  In *Shutts*, the Court rejected the idea that a plaintiff needed to affirmatively "opt in" to be bound by a class-action judgment.  The "essential question" was "how stringent the requirement for a showing of consent will be" to infer an agreement to be bound by the court's judgment.  *Id.* at 812.  The Court concluded that the procedure followed in that case, in which a descriptive notice was sent via first-class mail to each class member with an explanation of the right to "opt out," was sufficient to infer consent.  *Id.* at 801, 811–14.  The Court found the inference of consent appropriate under the circumstances because an absent plaintiff could "sit back and allow the litigation to run its course, content in knowing that there are safeguards provided for his protection."  *Id.* at 810.  The economics of consent further supported the opt-out.  Requiring a more demanding showing would be self-defeating: an absent "plaintiff's claim may be so small, or the plaintiff so unfamiliar with the law, that he would not file suit individually, nor would he affirmatively request inclusion in the class."

*Id.* at 813.   At the same time, if the "plaintiff's claim is sufficiently large or important that he wishes to litigate it on his own, he will likely have retained an attorney or have thought about filing suit, and should be fully capable of exercising his right to 'opt out.'"   *Id.*

*Shutts*'s logic applies "with full force" in bankruptcy proceedings.   Jonathan L. Goldberg, Note, *"Otherwise Consistent": A Due Process Framework for Mass-Tort Bankruptcies*, 98 N.Y.U. L. REV. 1696, 1727, 1720–1737, 1737 n.278 (2023).   The bankruptcy system provides a host of loyalty features that ensure adequate representation among the claimants.   The largest unsecured creditors form a committee to represent major constituencies, and, subject to court approval, those creditors retain counsel to monitor the debtor.   11 U.S.C. §§ 1102, 1103; *see also* Troy A. McKenzie, *Toward a Bankruptcy Model for Nonclass Aggregate Litigation*, 87 N.Y.U. L. REV. 960, 1020 (2012).   The committee acts as a fiduciary to those claimants, with the obligation to put the creditors' interests "ahead of their own for the benefit of all."   *In re Roman Cath. Diocese of Syracuse, N.Y.*, 667 B.R. 628, 634 (Bankr. N.D.N.Y. 2024).   In addition, the Trustee acts as a powerful watchdog protecting the creditors' interests.   *See* McKenzie, *Toward Bankruptcy*, 87 N.Y.U. L. Rev. at 1010.   No reorganization plan can be confirmed without the bankruptcy court's approval, which ensures that claimants are treated fairly and that the nondebtor releases are necessary.   *See In re Bestwall LLC*, 606 B.R. 243, 251 (Bankr. W.D.N.C. 2019) (concluding that claimants received due process based in part on the "approval of the plan of reorganization by both this Court and the District Court"), *aff'd*, 71 F.4th 168 (4th Cir. 2023).

Added to these loyalty protections are structural voice features that ensure the reorganization plan benefits the claimants.   By centralizing the creditors, debtors, and interested parties into a single forum, bankruptcy allows all the interested parties to negotiate the best, equitable resolution to an otherwise imminent business failure.   *See* Goldberg, *"Otherwise*

*Consistent"*, at 1735.  Claimants often have their own lawyers that advocate on their behalf as part of crafting this resolution.  *See, e.g.*, *In re Roman Cath. Diocese*, 667 B.R. at 635.  The Code's voting structure also provides the opportunity for parties to reject the plan if it does not sufficiently benefit their interests.  *See In re Combustion Eng'g*, 391 F.3d at 245 (asking whether the vote represents the "indicia of support by affected creditors" (quoting *In re Windsor on the River Assocs., Ltd.*, 7 F.3d 127, 131 (8th Cir. 1993))); *In re Bestwall LLC*, 606 B.R. at 251 (similar).  The Fifth Circuit carefully guards the vote to ensure that it accurately reflects whether the creditors think the plan is in their best interests.  *See In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) ("[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.").

The Code structures its proceedings to ensure that those most interested can participate "to safeguard the interests of all."  *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 319 (1950).  The Code ensures that a claimant can "sit back and allow the litigation to run its course, content in knowing that there are safeguards provided for his protection."  *Shutts*, 472 U.S. at 810. For this reason, bankruptcy courts may find that claimants "consent" to nondebtor releases in appropriate circumstances.  *Id.* at 812.  Bankruptcy courts evaluate consent to nondebtor releases "based on the unique facts and circumstances of the case at issue including the clarity of the language used, the history of the case, and the incentive for the affected creditors to engage in the bankruptcy case."  *In re Spirit Airlines*, 668 B.R. at 714.  Courts have considered many factors in determining whether the procedures around the opt-outs were sufficient to find consent, including:

- Whether the notice provided to the claimants was clear and prominent, *In re Avianca Holdings S.A.*, 632 B.R. 124, 137 (Bankr. S.D.N.Y. 2021);

- Whether the opt-out mechanism is easy to use, such as through an online portal, including whether there are multiple ways to opt out, *In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2022 WL 2206829, at *47 (Bankr. S.D.N.Y. June 18, 2022),

*aff'd*, 55 F.4th 377 (2d Cir. 2022); *cf. In re Washington Mut., Inc.*, 442 B.R. 314, 345, 352–53 (Bankr. D. Del. 2011) (noting that the releases were modified just before confirmation);

- Whether the opt-out mechanism was separate from the vote for or against the plan, *In re Spirit Airlines*, 668 B.R. at 709 n.22, 713; *cf. In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017);

- Whether the opt-out and nondebtor releases have been consistently discussed, presented, and debated over the history of the case, *In re Spirit Airlines*, 668 B.R. at 705 (collecting cases);

- Whether the case has been subject to publicity and is well-known to the claimant population, *In re Mallinckrodt PLC*, 639 B.R. 837, 880 (Bankr. D. Del. 2022); *In re Spirit Airlines*, 668 B.R. at 709–10;

- Whether the opt-out mechanism was used by claimants, *In re Spirit Airlines*, 668 B.R. at 708–09; *see also Shutts*, 472 U.S. at 813;[17]

- Whether there has been consistent and independent involvement of the creditor population in the bankruptcy proceedings, *In re Mallinckrodt*, 639 B.R. at 880–81; *In re Roman Cath. Diocese*, 667 B.R. at 635;

- Whether there is a substantial amount of affirmative support for the plan, *In re Spirit Airlines*, 668 B.R. at 708; *In re Mallinckrodt*, 639 B.R. at 881; *In re Bestwall LLC*, 606 B.R. at 251;

- Whether there are economic disincentives to follow the bankruptcy case or opt out, *see In re Spirit Airlines*, 668 B.R. at 704–05 (collecting cases); *cf. In re Chassix Holdings, Inc.*, 533 B.R. 64, 80–81 (Bankr. S.D.N.Y. 2015); *cf. also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 628 (1997);

- Whether the payout to the claimants is fair, reasonable, and adequate, *In re Spirit Airlines*, 668 B.R. at 710; *In re Roman Cath. Diocese*, 667 B.R. at 635; *cf. In re Chassix Holdings, Inc.*, 533 B.R. at 80, including whether it is necessary to the reorganization plan and to avert financial ruin, *In re Spirit Airlines*, 668 B.R. at 695–96, 712; *cf. In re Smallhold, Inc.*, 665 B.R. 704, 709 (Bankr. D. Del. 2024) (theorizing about a "college education fund" unrelated to the purpose of the bankruptcy); *cf. also Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 286 (7th Cir. 2002); *Staton v. Boeing Co.*, 327 F.3d 938, 961 (9th Cir. 2003);

---

[17] It is often difficult to assess this factor in isolation because opposing parties draw conflicting inferences from opt-out metrics. *See* Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action*, 92 N.Y.U. L. REV. 846, 863–64 (2017) (thinking through the ambiguous messages sent by opt-out results).

- Whether, if enough claimants opt out of the third-party releases, the plan will fail, *see* Goldberg, *"Otherwise Consistent"*, at 1737 n.278 (explaining that debtors and released nondebtors "must not only win enough votes to confirm a plan but also disincentivize enough opt-outs to make the reorganization economical"); *see, e.g.*, *In re Spirit Airlines*, 668 B.R. at 706 & n.16 (citing *In re Roman Cath. Diocese*, 667 B.R. at 635–36);

- Whether there are unique circumstances that might bear on whether the claimants are consenting to the release through silence, *see, e.g.*, *In re Roman Cath. Diocese*, 667 B.R. at 635 (discussing evidence attributing nonresponsiveness to the emotional difficulties raised by the nature of the claims against the estate).

In sum, "third-party releases through the use of opt-outs [can] be consensual—and permissible— under bankruptcy law after careful consideration of the circumstances within each case." *In re Azul S.A.*, ___ B.R. ____, 2026 WL 40912, at *9 (Bankr. S.D.N.Y. Jan. 6, 2026); *accord In re CJ Holding Co.*, 597 B.R. at 610. Courts can generally infer consent because a claimant knows that the reorganization, and the releases necessary to procure it, is in his or her best financial interests.

A rule that permits opt-outs on a case-by-case basis also complies with the "general rules" of contract law. *In re Tex. Com. Energy*, 607 F.3d at 158.[18] The Restatement (Second) of Contracts provides that "silence and inaction operate as an acceptance" when "the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer." Restatement (Second) of Contracts § 69(1)(b) (Am. L. Inst. 1981); *see* 2 Williston on Contracts § 6:70 (4th ed. Supp. 2025) ("[I]f the offeror has authorized silence as a means of indicating assent, and the offeree, by remaining silent, intends to manifest assent, every requirement for the formation of a contract seems satisfied."). The Restatement offers the following illustrations:

(2) A offers by mail to sell to B a horse already in B's possession for $250, saying: "I am so sure that you will accept that you need not trouble to write me. Your silence

---

[18] Similar principles are found throughout the law. For example, under the Fourth Amendment, if "silence follows a request for consent," then implicit consent "can be inferred from silence or failure to object to a search." *United States v. Staggers*, 961 F.3d 745, 757 (5th Cir. 2020).

alone will operate as acceptance."  B makes no reply, but he does not intend to accept.  There is no contract.

(4) The facts being otherwise as stated in Illustration 2, B makes no reply and remains inactive with the intention of thereby expressing his acceptance.  There is a contract.

RESTATEMENT (SECOND) OF CONTRACTS cmt. c, illus. 2, 4.  These illustrations show that the offeree's intent drives the analysis.  *Shutts* puts that principle into practice, asking whether the totality of the circumstances—including the efficacy of the notice, the economic incentives, and the structural protections for the absent party—are sufficient to find that the party consented to be bound by the outcome.  *See* 472 U.S. at 808–13.

Texas contract law—which the Trustee's reply brief argues is applicable here—applies these principles as well.  "[T]he parties' relationship or the surrounding circumstances justify the expectation of a reply; under proper circumstances the parties may be justified in assuming inaction or silence indicates approval."  *Com. Bank of Tex., N.A. v. Luce*, 92 S.W.3d 636, 639 (Tex. App.—Beaumont 2002, no pet.) (citing WILLISTON ON CONTRACTS § 6:49–54); *see also Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 386 (5th Cir. 2001) (Louisiana law).  "Silence, plus forbearance, may, in some cases, constitute an acceptance."  *Union Carbide Corp. v. Jones*, No. 01-14-00574-CV, 2016 WL 1237825, at *6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2016, no pet. h.) (mem. op.).  "Whether silence is acceptance . . . is a question of fact."  *Supply Pro, Inc. v. Ecosorb Int'l, Inc.*, No. 01-15-00621-CV, 2016 WL 4543136, at *5 (Tex. App.—Houston [1st Dist.] Aug. 30, 2016, pet. denied); *see Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 73 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("The existence of an implied contract involves inferences drawn from circumstantial evidence and is therefore a question of fact.").  As a result, courts will send such cases to the jury for a determination that a contract exists.  *See, e.g*, *Luce*, 92 S.W.3d at 639; *Union Carbide*, 2016 WL 1237825, at *6.  Just as a jury can infer consent

from silence in appropriate cases, so too may bankruptcy courts, even under state contract law. *See In re Spirit Airlines*, 668 B.R. at 717–21.

To be sure, as the Trustee argues, the general rule is that silence does not constitute acceptance. But the Trustee cites cases that illustrate the rule that proves the exception. *Imperial Industrial* concerned "[t]acit acquiescence between relative strangers" who had been involved in a single transaction. *Imperial Indus. Supply Co. v. Thomas*, 825 F. App'x 204, 206 (5th Cir. 2020) (per curiam). The same is true for *Norcia v. Samsung Telecommunications America, LLC*, 845 F.3d 1279 (9th Cir. 2017); *see In re Spirit Airlines*, 668 B.R. at 718 n.36 (distinguishing *Norcia*), which is also a decision with which other courts have disagreed, *see Hill v. Gateway 2000*, *Inc.*, 105 F.3d 1147, 1150 (7th Cir. 1997). By contrast, creditors are creditors because they have a pre-existing financial relationship that continued through the filing of the bankruptcy petition. *See* 11 U.S.C. § 101(10). Although not every creditor is closely related to the debtor, it is unfair to equate them to total strangers or disinterested parties. *See In re Yentis*, 125 B.R. 158, 163 n.6 (N.D. Tex. 1991) ("The Bankruptcy Code contemplates that concerned creditors will take an active role in protecting their claims.").

"Bankruptcies, in this regard, give rise to unique moral and ethical concerns because each creditor's action may affect the rights of every party in interest." *In re Teligent, Inc.*, 282 B.R. 765, 772 (Bankr. S.D.N.Y. 2002). "The fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984). "In bankruptcy, everyone's fate—the debtors, its employees and its creditors—is often intertwined and dependent on the success of a plan." *In re Teligent, Inc.*, 282 B.R. at 772. Although it may be unreasonable to impose on creditors an unequivocal duty to speak up—such that opt-outs under any condition are

36

acceptable—it is often "reasonable" to assume that the creditor "should notify [the bankruptcy parties] if he does not intend to accept," RESTATEMENT (SECOND) OF CONTRACTS § 69(1)(c), because everyone else is relying on him, *see, e.g.*, *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1266–68 (10th Cir. 1988) (concluding that a creditor accepted an impairment by failing to object after receiving notice of the impairment under the plan); *In re Szostek*, 886 F.2d 1405, 1413 (3d Cir. 1989) (similar); *Shaw v. Aurgroup Fin. Credit Union*, 552 F.3d 447, 457 (6th Cir. 2009) (similar); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 224 (Bankr. S.D.N.Y. 2007) (similar); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 430 (Bankr. S.D. Tex. 2009) (similar); *In re Trib. Co.*, 464 B.R. 126, 183–84 (Bankr. D. Del. 2011) (similar), *aff'd*, 972 F.3d 228 (3d Cir. 2020). When reorganizations plans are achieved through hard-fought negotiation by the interested parties, including those similarly situated to the silent creditor; inure to the creditor's benefit; give creditors proper notice; and require substantial consent to the third-party releases for the plan's success, it is reasonable to infer an intent to accept the plan from a creditor's silence.

The Trustee argues in part that the opt-out theory is not viable after *Purdue* because it depends on the premise that the claimant "defaulted" and could be bound under the Bankruptcy Court's pre-*Purdue* power to enter nonconsensual releases. (Docket Entry No. 2 at 44). The Trustee relies heavily on *In re Smallhold*, an opinion from the Bankruptcy Court for the District of Delaware, for this assertion. But this argument, and *In re Smallhold*'s default theory, are unpersuasive, for two reasons. First, *Shutts* bars this argument.[19] The question in *Shutts* was

---

[19] The Trustee tries to distinguish *Shutts* by arguing that the Supreme Court distinguished consent to personal jurisdiction from consent to state law. (Docket Entry No. 18 at 26). This argument misreads *Shutts*. The *Shutts* Court questioned whether the absent plaintiffs, by consenting to be bound by the judgment, also consented to be bound by Kansas law as the rule of decision, without answering the question specifically. 472 U.S. at 820. That caution is reasonable, as no absent plaintiff should know about, and thus have reason to agree to, the application of a specific state's substantive law. The Court's caution reaffirms that the existence and scope of consent to be bound by court proceedings through a failure to opt out depends on the circumstances.

whether the Kansas court had personal jurisdiction over the absent plaintiffs. *Shutts*, 472 U.S. at 806. The Court held that the Kansas court had jurisdiction over the plaintiffs because they had consented to jurisdiction by declining to opt out. *See id.* at 812–14. If the failure to opt out did not equate to consent to jurisdiction, then even the plaintiffs' status as a party to the litigation under the class-action procedure would not have bound them to the Kansas court's judgment. *See Juris v. Inamed Corp.*, 685 F.3d 1294, 1330 (11th Cir. 2012); *see also Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982) (explaining that parties may ignore judicial proceedings and contest personal jurisdiction collaterally). Under *Shutts*, courts can infer consent in appropriate circumstances from the failure to opt out after proper notice. Second, "the Fifth Circuit has never permitted the grant of nonconsensual third-party releases in bankruptcy cases, but courts in that Circuit have routinely allowed consensual releases using an opt-out mechanism before *Purdue*." *In re Spirit Airlines*, 668 B.R. at 715. Because *Purdue* did not overturn this Circuit's longstanding practice of using opt outs, "the *Smallhold* court's default theory cannot be reconciled with the approach of the Fifth Circuit on this issue." *Id.*

The Trustee's remaining argument that reliance on *Shutts* and class-action jurisprudence contravenes the Supreme Court's warning about "de facto" class actions is unpersuasive, for three reasons. First, each of the cases in which the Supreme Court has cautioned parties about creating a "de facto" class action occurred in the context of traditional civil litigation. *See, e.g.*, *Richards v. Jefferson County*, 517 U.S. 793, 802 (1996); *Taylor*, 553 U.S. at 901; *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011); *United States v. Sanchez-Gomez*, 584 U.S. 381, 389 (2018). Outside of Rule 23, there are no protections or procedures for absent litigants from which a court can infer consent to a judgment. By contrast, and as discussed, bankruptcy provides a host of analogous, if not stronger, structural protections that permit an inference of consent. Second, some class actions are

distinguishable because they can bind parties without notice and an opportunity to exit, even if monetary claims are at stake. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846–48 (1999); *Taylor*, 553 U.S. at 900–01; *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 364 (2011). Procedural rigidity is necessary to ensure that even *nonconsenting* plaintiffs receive due process; as the Trustee concedes, the rule does not ensure that *all* parties consent. *See Taylor*, 553 U.S. at 893–95 (placing consent to be bound by a judgment and class actions in separate doctrinal categories). The concern is not warranted here, because the Code requires procedures to obtain and make findings of consent to opt out. Third, the bankruptcy courts are making largely individualized (or group-based) determinations of consent for claimants. If a finding of consent is inappropriate for a group or even an individual claimant, then they are not bound by the releases.

For these reasons, consistent with its longstanding precedent, the court holds that the failure to opt-out constitutes consent to a third-party release under the appropriate circumstances.

### 3.    The Bankruptcy Court's Findings

The remaining question is whether the Bankruptcy Court erred in finding that the claimants consented to the nondebtor releases. The Trustee argues that the Bankruptcy Court erred as matter of law by not applying state contract law; takes a view of state law that is highly formalistic; and assumes that consent could not be found on this record as a matter of law. Only in passing does the Trustee connect specific facts from the record to the law. That is not sufficient. *See ODonnell*, 2025 WL 3033987, at *9 n.4. Unsurprisingly, the Debtor's response brief does not focus on the record and the bases for the Bankruptcy Court's findings. Although this court would be justified in affirming the Bankruptcy Court's findings as practically unchallenged, the Trustee does raise one error that requires examination. *See United States v. Alvarado-Santilano*, 434 F.3d 794, 795

(5th Cir. 2005) (explaining that appellate courts may raise clear, prejudicial error). A review of the findings below is necessary.

The Bankruptcy Court found that the nondebtor releases were consensual based on the factors that courts in the Fifth Circuit have been applying for "many years." (Bankr. Docket Entry No. 280 at 9). The Bankruptcy Court found that the "third-party releases were integral to the Plan," allowing unsecured creditors to become unimpaired (given in exchange for the new money needed to provide liquidity)" and allowing secured parties to receive well more than the "pennies on the dollar" that they otherwise would have received. (*Id.* at 9–11). The Bankruptcy Court found that all parties received sufficient notice of the Plan details, the deadline to object to confirmation, the voting deadline, and their ability to opt out. (*Id.* at 9–10). The Bankruptcy Court rejected the Trustee's argument that notice of how to opt out was ineffective. (*Id.* at 10). The Court instead concluded that many of the unsecured creditors did not opt out because they were being paid in full, rather than face a hopelessly insolvent company that could not reorganize. (*Id.* at 10–11). The Bankruptcy Court applied well-established law in this Circuit and made appropriate findings of consent, which would likely hold even under state law.

With a narrow exception, the Trustee's arguments do not justify reversing the Bankruptcy Court. First, the Trustee argues that those who voted for the Plan but failed to opt out did not consent. This argument has been rejected, even by courts who otherwise have rejected opt outs to nondebtor releases. The creditors "undertook an affirmative act by returning a ballot, indicating that the creditor was actively engaged in the process and affirmatively chose to not check the opt-out box," whether or not they "voted to accept the Plan or to reject the Plan." *In re Spirit Airlines*, 668 B.R. at 720; *see also In re Smallhold*, 665 B.R. at 723–25. There is ample basis to find that a party who voted against the Plan but did not opt out intended to grant the nondebtor release because

a vote against speaks to the "Plan's treatment of the creditor's allowed claim." *In re Smallhold*, 665 B.R. at 724 (emphasis omitted). Creditors may vote against how they are treated under the Plan without signaling that they opposed the third-party releases, which may be viewed (as found here) as essential to the Plan. A vote against the Plan may signal dissatisfaction with a creditor's individual treatment; a decision not to opt-out signals an overarching desire for a successful reorganization. The Bankruptcy Court's findings of consent for the Class 3 voters are "plausible in light of the full record." *In re Mahadevan*, No. AP 21-03054, 2025 WL 3296001, at *3 (S.D. Tex. Nov. 24, 2025) (quoting *Sweet Additions Ingredient Processors, LLC v. Meelunie Am., Inc.*, 139 F.4th 1217, 1225 (11th Cir. 2025) (per curiam)).

The Trustee briefly argues that it is unfair to find that some of the claimants consented by not opting out because those who could not vote may not have read the full notice; because the notice was otherwise confusing and in multiple parts; and because some returned opt outs were not complete. (Docket Entry No. 2 at 40–41). The Trustee does not point to case law supporting an inference that the notice was materially deficient or undermining the Bankruptcy Court's finding that the notice was effective. *Cf. In re Spirit Airlines*, 668 B.R. at 703–09 (discussing other cases and the notice provided). The Trustee instead uses these concerns to argue more broadly that courts should never infer consent from a failure to opt out. (*See* Docket Entry No. 2 at 41–43). But the Bankruptcy Court found that the releases were necessary to the successful reorganization; that the company was hopelessly insolvent; that the reorganization enabled the secured creditors to make substantial recoveries and the unsecured credits to become unimpaired; and that the creditors consented to the releases for that reason. (Bankr. Docket Entry No. 280 at 10–11). The fact of unanimous creditor support among voting parties and absence of creditor objections further support the Bankruptcy Court's findings. (*See* Bankr. Docket Entry No. 181 at

10).  The Trustee does not meaningfully contest the Bankruptcy Court's findings based on the totality of the circumstances.  *See also In re Spirit Airlines, Inc.*, 668 B.R. at 714 (concluding that consent via opt-outs was valid in part because "all affected creditors" received a "substantial recovery, and general unsecured creditors receiv[ed] 100% distributions").

Despite the largely uncontested findings, it is clear that two groups of claimants who received notice and an opt-out opportunity did not consent to the third-party releases: the subordinated-claims holders in Class 5 and the equity holders in Class 8.[20]  These claimants were not allowed to vote because they received nothing under the Plan and were deemed to reject it. (*See* Bankr. Docket Entry No. 181 at 100–03).  There is no basis to find that claimants "who did not respond wanted, in addition losing their equity, to give up even more by releasing claims." (Docket Entry No. 18 at 17).  These claimants could not "sit back . . . content" in knowing that the reorganization would secure them equitable recovery.  *See Shutts*, 472 U.S. at 810.  The notice informed them that they would receive nothing.  (Bankr. Docket Entry No.  81 at 42).  They had no incentive to accept the releases to help the reorganization.  Courts consistently avoid applying releases to claimants who receive nothing under a reorganization plan.  *See In re Emerge Energy Servs. LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (holding that the classes of equity holders who received little or nothing from the bankruptcy did not consent to the third-party release by failing to opt out); *In re Spirit Airlines*, 668 B.R. at 704 n.14, 714 (ensuring that the "equity holders here—the only parties who receive no recovery under this Plan—are not subject to the Third-Party Releases at all"); *In re Avianca Holdings*, 632 B.R. at 133

---

[20] When discussing classes that were "wiped out," the Trustee focuses exclusively on the equity holders, (*see, e.g.*, Docket Entry No. 2 at 39), but the Plan treats Class 5 and Class 8 claimants the same.  The court does not see—and the Trustee does not point to—a concrete indication in the record that Class 5 claimants are no longer relevant to this appeal.  Despite the exclusive reference to "equity holders" as the "wiped out" class, for both caution and completeness, the court proceeds by treating Class 5 and Class 8 claimants alike.

(same).  There is no basis in the record to depart from these rulings.  The Bankruptcy Court's findings of consent for these claimants are inconsistent with its findings as to the other creditors who received substantial recovery.  The Bankruptcy Court erred by finding that the claimants in Class 5 and Class 8 consented to the third-party releases by failing to opt out.

In sum, the third-party releases are consensual, with the exception of claimants in Class 5 and Class 8, who received no recovery under the Plan and were deemed to reject it.

### B.    The Permanent Injunction

In addition to its objections to the third-party releases, the Trustee argues that the Bankruptcy Court erred by entering a permanent injunction barring claims between nondebtors. (Docket Entry No. 2 at 51).  This provision, contained in Article IX.E, enjoins any person or entity from bringing a released claim.  (Bankr. Docket Entry No. 181 at 135).  The Bankruptcy Court had found that the injunction provision was within its jurisdiction under 28 U.S.C. § 1334; was necessary to preserve and enforce the releases and was narrowly tailored to achieve that purpose; was an integral part of the Plan; was in the best interest of the Debtors, their estates, and the claimants; and was, like the third-party releases, consistent with §§ 105, 1123, 1229 and other applicable Code provisions.  (*Id.* at 15–16).

The Trustee challenges the permanent injunction on a variety of grounds.  First, the Trustee contests the Bankruptcy Court's jurisdiction to issue the injunction under 28 U.S.C. § 1334(b), which provides a bankruptcy court with jurisdiction over proceedings "related to" a bankruptcy case. (Docket Entry No. 2 at 52).  The Trustee argues that the Bankruptcy Court lacked jurisdiction to enter the injunction under this statute because the enjoined claims between thousands of nondebtors "do not 'relate to' Debtors' chapter 11 case" after Plan confirmation.  (*Id.*).  The Trustee argues that "[p]ost-confirmation jurisdiction is more limited."  (*Id.*).  This argument is

refuted by the Fifth Circuit caselaw holding that so long as a bankruptcy court has "related to" jurisdiction over certain claims at the outset of a case, it may enter a permanent injunction as to those claims.

For example, the Fifth Circuit in *Zale* rejected the argument that bankruptcy courts lacked jurisdiction to enter a permanent injunction because the third-party claims "will have no effect on the estate after confirmation of the plan." 62 F.3d at 759. It held instead that "because jurisdiction existed" over the third-party contract claims during the bankruptcy case, "the bankruptcy court had jurisdiction over the request for injunctive relief on the contract claims." *Id.*; *see also In re Morris*, 950 F.2d 1531, 1534 (11th Cir. 1992) (asking whether the dispute "was related to the bankruptcy case at the time of its commencement"). Similarly, *Craig's Stores* distinguished "post-confirmation relations between the parties" from "a post-confirmation dispute over" a matter "provided for in the debtor's reorganization plan." *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 391 (5th Cir. 2001). The court recognized that, under Fifth Circuit precedent, the Bankruptcy Court has core jurisdiction over a "settlement of a creditor's claim" that is "part of the reorganization plan itself." *Id.* (citing *In re Case*, 937 F.2d 1014, 1017 (5th Cir. 1991)).

The Trustee's argument rests on legal principles pertinent to claims that were not within the Bankruptcy Court's "related to" jurisdiction before confirmation or that arise from post-confirmation conduct. The Trustee does not argue the former, and, as noted above, the Supreme Court has recognized that Congress granted courts jurisdiction over "suits between third parties which have an effect on the bankruptcy estate." *Celotex Corp.*, 514 U.S. at 307 n.5; *see also In re CJ Holding Co.*, 597 B.R. at 601, 610 (analyzing a permanent injunction coextensively with a third-party release and concluding that the bankruptcy court had subject-matter jurisdiction under § 1334(b) to release and enjoin the plaintiff's sexual harassment, discrimination, and retaliation

claims based on alleged pre-petition conduct). Meanwhile, the Trustee's latter argument is inapplicable because no post-confirmation conduct is at issue here. The Bankruptcy Court had jurisdiction to issue the permanent injunction.

Next, the Trustee argues that the Debtors lacked standing to seek the permanent injunction because they did not show that their potential injury was "real and immediate, not conjectural or hypothetical." (Docket Entry No. 2 at 53 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983))). But the Bankruptcy Court found that the third-party releases were "a necessary and integral aspect" of the Plan and that the injunction was the "way you enforce the third-party releases." (Bankr. Docket Entry No. 181 at 14; Bankr. Docket Entry No. 201 at 43). The Trustee has pointed to no case law supporting its argument that the Debtors lacked standing to seek an injunction that the Bankruptcy Court concluded was critical to the success of the Plan. The Trustee cites *In re Stewart*, 647 F.3d 553 (5th Cir. 2011), but that case is inapposite. *In re Stewart* involved a bankruptcy court's order of broad injunctive relief against Wells Fargo in a variety of other bankruptcy cases based on a single debtor's bankruptcy case. 647 F.3d at 557. The Fifth Circuit accepted that bankruptcy courts have the "power to address certain issues collateral to the case before it," but concluded that a wide-ranging injunction was not "shown to be sufficiently necessary" under the circumstances. *Id.* at 558. In contrast, this case involves injunctive relief explicitly tied to the third-party releases contained in the confirmation order entered by the Bankruptcy Court. This injunction merely enforces the releases, which are based on claims related

to the Debtors and their affiliates.[21]  This case does not raise the questions that led to the *In re Stewart* decision.

Finally, the Trustee argues that there is "no authority in the Bankruptcy Code for the injunction barring claims between non-debtors."  (Docket Entry No. 2 at 54).  It argues that the Debtors cannot rely on § 105(a) because "nothing in the Code authorizes the court to use its judicial power to bar claims between non-debtors." (*Id.*).  But, as discussed, the Bankruptcy Code provides authority for a Bankruptcy Court to enter consensual third-party releases under § 1123(b)(6).  The injunction is simply an enforcement tool, meaning it was appropriate for the Bankruptcy Court to conclude that the injunction provision was necessary and authorized under § 105(a).  (Bankr. Docket Entry No. 181 at 15–16 (stating that the injunction was "necessary" and "consistent with" §§ 105, 1123, and 1129)).  Unlike in the Fifth Circuit cases that have rejected permanent injunctions as outside the power of § 105, the injunction here is coextensive with a *consensual* release authorized by §1123(b)(6).  *Cf. In re Zale Corp.*, 62 F.3d at 760 ("Accordingly, because the permanent injunction as entered improperly discharged a potential debt of . . . a nondebtor, the bankruptcy court exceeded its powers under § 105); *Highland II*, 132 F.4th at 358–59 (discussing *Zale* and *In re Pacific Lumber Co.*).  The Bankruptcy Court was not using § 105(a) to "act as [a] 'roving commission[] to do equity'" but instead to have the injunction serve as a limited enforcement tool to support a third-party release authorized elsewhere by the Code.  *In re Southmark Co.*, 49 F.3d 1111, 1116 (5th Cir. 1995) (quoting *In re Haber Oil Co.*, 12 F..3d 426, 443 (5th Cir. 1994)).

---

[21] The Trustee did not argue before the Bankruptcy Court, (Bankr. Docket Entry No. 150 at 31–32), and does not argue on appeal, (*see generally* Docket Entry Nos. 2, 18), that the injunction provision goes beyond enforcement of the third-party release barring claims against nondebtors.

For similar reasons, the Trustee's argument that the Bankruptcy Court needed to explicitly run through the permanent injunction factors appears to hold no water. Courts routinely uphold permanent injunctions coextensive with proper releases contained in reorganization plans. *See, e.g.*, *In re CJ Holding Co.*, 597 B.R. at 610 (construing the plaintiff's silence as consent to the reorganization plan and stating that the bankruptcy court did not err in approving *both* the third-party release and permanent injunction enforcing that release contained in the plan); *Highland I*, 48 F.4th at 438 (holding that the permanent injunction was "otherwise affirm[ed]" once the related nonconsensual exculpation provision was appropriately narrowed); *see also In re Zale*, 62 F.3d at 761 (explaining that an injunction may be warranted if the settlement it enforces is "unquestionably an essential element" of the reorganization plan and the injunction is a "key component" of the settlement (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992))).

Entering the injunction was also permissible under the Bankruptcy Court's alternative authority to enter a consent decree. *See Firefighters*, 478 U.S. at 525; *United States v. Michigan*, 131 F.4th 409, 423–24 (6th Cir. 2025) (holding that courts do not need to apply "the traditional four-part test for injunctive relief" to approve a consent decree). The Trustee argues that the parties did not consent to the injunction because there were not separate opt-out boxes for the releases and the injunction. (Docket Entry No. 2 at 46). This argument is unpersuasive; parties can consent to a release and an injunction as a package deal. In *In re CJ Holding Co.*, the court approved the third-party release *and* permanent injunction in the confirmation order based on the plaintiff's silent consent to the confirmation order alone. 597 B.R. at 608–10, 614. When, as here, an injunction merely enforces a release, there is no reason to separate consent for one from consent for the other. Assuming that a claimant would choose not to opt out of the third-party release but would want to opt out of a coextensive injunction is inconsistent; a claimant would not want to

proceed on a claim on which they cannot succeed. *Cf. Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.) ("[O]nly a lunatic or a fanatic sues for $30."). A separate checkbox for the injunction would serve no practical or logical purpose.

In sum, the court approves the permanent injunction and has found no cause to strike it from the Plan. The injunction does not apply, however, to the claimants in Classes 5 and 8.

### C.    The Gatekeeping Provision

Finally, the Debtor and the Trustee contest the validity and the scope of the gatekeeping provision.[22] This provision states that "[n]o Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonable likely to relate to any act or omission in connection with, related to, or arising out of a Claim or Cause of Action, as applicable, subject to Article IX hereof," without the Bankruptcy Court determining that the claim is "colorable" and "specifically authorizing" that person or entity to bring that claim. (Bankr. Docket Entry 181 at 135–36). While the permanent injunction provides an expeditious defense to a subsequent lawsuit by a claimant, the gatekeeping provision makes the defense unnecessary by requiring claimants to ask the Bankruptcy Court for leave to sue in the first place. The Trustee challenges the gatekeeping provision as, among other things, outside of the Fifth Circuit's recent authorization in the *Highland* cases. (Docket Entry No. 18 at 31).[23] The court agrees, although it narrows rather than strikes the whole provision.

---

[22] The parties refer to this provision as the "gatekeep*ing* provision" or "gatekeep*ing* injunction." (*See, e.g.*, Docket Entry No. 2 at 56; Docket Entry No. 13 at 52). In the *Highland Capital* cases, the Fifth Circuit referred to a similar provision as the "gatekeep*er*" clause or provision. There is no difference.

[23] The Trustee also argues that, as with the injunction, the Bankruptcy Court lacked both jurisdiction and standing to enter the gatekeeping provision. (Docket Entry No. 2 at 56). The court rejects those arguments for the same reasons it rejected those arguments as to the permanent injunction.

"Courts have long recognized bankruptcy courts can perform a gatekeeping function." *Highland I*, 48 F.4th at 439.  But bankruptcy courts "nonetheless do not have unrestricted power to protect non-debtors from liability via a pre-filing injunction."  *Highland II*, 132 F.4th at 359.  Historically, the "*Barton* doctrine"[24] allows bankruptcy courts to serve as a gatekeeper "when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity."  *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015).  The Fifth Circuit has also held that bankruptcy courts may perform a limited gatekeeping function when exercising their "significant discretionary power to manage their docket" under § 105.  *In re Salubrio, L.L.C.*, No. 23-50288, 2024 WL 1795773, at *2 (5th Cir. Apr. 25, 2024) (per curiam).  But beyond the few individuals identified in *Villegas*—the trustee or other bankruptcy-court-appointed officers—the Fifth Circuit has "never extended the *Barton* doctrine to give bankruptcy courts gatekeeping power over claims against non-debtors."  *Highland II*, 132 F.4th at 359.

In *Highland II*, the Fifth Circuit clarified its holding in *Highland I*.  The Fifth Circuit found that the "proper reading" of *Highland I* was to narrow the definition of "Protected Parties" in the gatekeeper provision of the reorganization plan to be coextensive with the definition of "Exculpated Parties" in the exculpation provision.  132 F.4th at 360.  Because the original exculpation provision improperly nonconsensually released third parties, the Fifth Circuit had narrowed the class of exculpated parties down to trustee-like figures who could be nonconsensually released.  The only parties protected by the gatekeeper provision in the Fifth Circuit's final version were "(i) the Debtor; (ii) the Independent Directors [of the debtor company], for conduct within the scope of their duties; (iii) the Committee [of unsecured creditors]; and (iv)

---

[24] *Barton v. Barbour*, 104 U.S. 126 (1881).

the members of the Committee in their official capacities, for conduct within the scope of their duties." *Id.* at 358.[25]  Due to the unusual nature of the bankruptcy, these figures all seemed to fall within the Fifth Circuit's understanding of persons and entities covered by the *Barton* doctrine; the final gatekeeper clause went no further than these pre-existing limits.[26]

Despite *Highland II*'s narrow understanding of gatekeeping provisions, the Debtors make two arguments in favor of the expansive provision here, both based on § 105.  First, relying on *In re Salubrio*, they assert that bankruptcy courts have "discretionary power" to manage their dockets under § 105, and that, like the permanent injunction, the gatekeeper provision is just "another layer of protection" for released parties.  (Docket Entry No. 13 at 63–64).  *In re Salubrio*, however, concerned a gatekeeping provision directed at a single identified vexatious litigant.  2024 WL 1795773, at *1.    In *Highland I*, the Fifth Circuit distinguished vexatious litigant injunctions, noting—in a footnote about narrowing the injunction and gatekeeper provisions—that "[n]othing in this opinion should be construed to hinder the bankruptcy court's power to" designate certain figures in the bankruptcy as vexatious litigants, but that "non-debtor exculpation within a reorganization plan is not a lawful means to impose vexatious litigant injunctions and sanctions." 48 F.4th at 439 n.19.  There is no basis for relying on a bankruptcy court's authority under § 105

---

[25] The gatekeeper provision had previously applied to: "collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv)." *Highland II*, 132 F.4th at 356.

[26] As explained in *Highland I*, for "nontraditional" reasons, the independent directors were appointed to act as the bankruptcy trustee for Highland Capital.  48 F.4th at 437.  Meanwhile, the members of the Unsecured Creditors' Committee were appointed by the Trustee.  *Id.* at 425.  Finally, the court allowed the gatekeeping provision to cover Highland Capital itself under the *Barton* doctrine because "Highland Capital, for all practical purposes, was a debtor in possession entitled to the rights of a trustee."  *Id.* at 439 n.17.

to issue limited gatekeeping provisions against individuals identified as vexatious to support the worldwide gatekeeping provision at issue here, which states broadly that "No Person or Entity" may commence certain claims without the Bankruptcy Court's permission.

Second, the Debtors note that *Highland II* states that "injunctions . . . may not be entered to protect non-debtors not legally entitled to release." 132 F.4th at 348. In the Debtors' view, the question is whether the gatekeeping provision exceeded the scope of the exculpation provision and consensual third-party release here. (Docket Entry No. 13 at 66). The Fifth Circuit made that statement in *Highland II* while examining the traditional injunction that enforced the exculpation provision, not the gatekeeper provision. In the separate section on the gatekeeper provision, the Fifth Circuit made clear that bankruptcy courts have only limited power to protect nondebtors from liability through such injunctions, and that the *Barton* doctrine has "never" been extended to allow bankruptcy courts to enforce gatekeeping provisions against nondebtors. *Highland II*, 132 F.4th at 359. The Fifth Circuit's analysis of the gatekeeper provision was tethered to the legality of the releases at issue only to the extent that those releases had already been narrowed down to trustee-like figures covered by the *Barton* doctrine; the gatekeeper provision and the final exculpation provision were necessarily coextensive. The Fifth Circuit neither held nor implied that *consensual* third-party releases could allow a bankruptcy court to authorize gatekeeping provisions beyond the bounds of the *Barton* doctrine under § 105. Rather, doing so would be "patently beyond the power of an Article I court under § 105." *Id.* at 362.

Even if limited only to the Debtors and the parties who consented to the third-party release, the Plan's broad gatekeeping provision still exceeds the Bankruptcy Court's equitable authority to enter consent decrees. "[T]he permissible scope of a consent decree is not unlimited." *Smith*, 906 F.3d at 335. "Consent decrees entered in federal court must be directed to protecting federal

interests" and "must further the objectives of the law upon which the complaint was based." *Frew*, 540 U.S. at 437. The *Barton* doctrine "prevents usurpation of the powers and duties which belong exclusively to the appointing bankruptcy court that would make impossible of performance the duty of that court to distribute the trust assets to creditors equitably and according to their respective priorities." *Highland II*, 132 F.4th at 359 (cleaned up) (quoting *Barton*, 104 U.S. at 136). It protects court officers from unjustified personal liability for acts taken within the scope of their official duties. *See Carroll v. Abide*, 788 F.3d 502, 506 (5th Cir. 2015). The gatekeeping provision here extends the *Barton* doctrine beyond these limits to cover people and entities who are not officers of the Bankruptcy Court and to cover conduct that is not within the scope of their official duties. The provision does not further the objectives of the Code and creates unnecessary conflict with First Amendment rights to access the courts. *Cf. Venable v. Keever*, 61 F. Supp. 2d 552, 559–60 (N.D. Tex. 1999) (discussing the First Amendment right to access the courts). A federal court cannot, consistent with its equitable authority, enter a gatekeeping provision beyond the limited scope of the *Barton* doctrine.

The Plan's gatekeeping provision must be limited to the scope of *Highland II*, which in turn limits the provision to the *Barton* doctrine. Because the parties did not brief this issue, the court remands it. The Bankruptcy Court must in the first instance determine who may, consistent with *Highland II* and the *Barton* doctrine, be included in the gatekeeping provision.[27]

---

[27] This appeal was filed in February 2024, and *Highland II* (which significantly clarified *Highland I*) was published in March 2025. The Bankruptcy Court did not have the opportunity to consider *Highland II*. In any event, the court concludes that the Bankruptcy Court's assertion that "*Highland Capital* permits the gatekeeping function with respect to the exculpated parties, which, in this case, is only the Debtor, as well as the parties that are released," is inconsistent with *Highland I* and *Highland II*'s narrow understanding of gatekeeping provisions, which limited them to the *Barton* doctrine. (Bankr. Docket Entry No. 201 at 43).

## V.    Conclusion

The court affirms in large part and reverses in limited part the judgment of the Bankruptcy Court.  The court affirms the third-party release and permanent injunction except as applied to Class 5 and Class 8 claimants.  The court narrows the scope of the gatekeeping provision to the limits imposed by *Highland II* and leaves it to the Bankruptcy Court to determine the provision's proper scope in the first instance.  The court denies the motion to dismiss.  (Docket Entry No. 12). The court denies the motion to stay.  (Docket Entry No. 17).  The court remands to the Bankruptcy Court for proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED IN PART.**

SIGNED on February 12, 2026, at Houston, Texas.

_____

Lee H. Rosenthal
Senior United States District Judge